## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Boris A. Miksic,

        Plaintiff,

    v.

Boeckermann Grafstrom Mayer, LLC, a
Minnesota limited liability company, f/k/a
Johnson, West & Co. P.L.C., Boeckermann
Grafstrom Mayer, P.A., and Johnson West
& Co. P.L.C.

        Defendants.

Court File No. 15-cv-00539-JRT-BRT

**MEMORANDUM IN SUPPORT OF
MOTION FOR LEAVE TO AMEND
COMPLAINT TO ALLEGE PUNITIVE
DAMAGES**

## <u>INTRODUCTION</u>

Plaintiff Boris A. Miksic ("Miksic") alleges that his former accounting firm—Defendants Boeckermann Grafstrom Mayer, LLC and its defendant-predecessors (collectively "BGM")—engaged in negligence and malpractice in connection with various tax matters and related filings over the course of a number of years. In particular, BGM failed to file documents disclosing Miksic's ownership of foreign corporations and foreign accounts with the IRS. That failure constitutes a gross breach of BGM's duty of care and has resulted in over $2 million in IRS penalties, fees, and interest and over $500,000 in legal and accounting fees associated with attempts to mitigate those IRS penalties.

Miksic moves to amend his complaint to assert a claim against BGM for punitive damages. Minnesota law requires Miksic simply to establish a prima facie case to allege punitive damages. Miksic must submit evidence that BGM knew or should have known

of his tax-filing obligations and acted with indifference to the high probability of injury to Miksic. The facts easily clear that standard. Miksic's motion should be granted.

## FACTUAL BACKGROUND

**A.    The parties**

Boris Miksic is a Croatian-American entrepreneur who lives in the United States. Affidavit of Michael M. Sawers, Ex. 1 (Miksic Dep. 14:13-16).[1] Miksic owns various American and Croatian companies. *See Id.* (Miksic Dep. 19:3-20:5; 28:1-32:6) (discussing ownership interests in various foreign and domestic companies). One such company is Minnesota-based Cortec Corporation, of which Miksic is the sole shareholder.  *Id.* (Miksic Dep. 19:3-20:5). Over 25 years ago, Miksic retained BGM as his certified public accountants (CPAs); BGM performed services for Miksic individually as well as Cortec. *Id.* (Miksic Dep. 49:9-12; 50:12-15). Originally, he retained Defendant Johnson West as his accountants; BGM and Johnson West merged in 2012. *Id.*; Ex. 42.

At the outset, Miksic's primary CPA was Clifford Lozinski. Lozinski retired in 2006 and CPA Cory Parnell assumed primary responsibility for Miksic's accounting and tax services.  Ex. 1 (Miksic Dep. 34:3-5). Parnell worked with Miksic for approximately eighteen years.  Ex. 4 (Parnell Aff. ¶ 4). CPA Corey Edmunds also took on a substantial role in providing Miksic accounting and tax advice and services.  Ex. 5 (Edmunds Aff. ¶ 4).

---

[1] Unless otherwise noted, all exhibits are attached to the Affidavit of Michael M. Sawers.

**B.    Delinquent Forms**

Relevant to this matter, Lozinski prepared Miksic's return for tax year 2006; Parnell prepared tax year 2007  (Ex. 4 (Parnell Aff. ¶ 4)); and Edmunds assisted with tax year 2007 and prepared tax years 2008, 2009, and 2010.[2] Ex. 2 (Edmunds Dep. 47:8-20; 71:5:11; 74:7-21; 79:1-5). As described further below, throughout the course of his relationship with BGM, Miksic provided and BGM received, substantial information relating to Miksic's foreign interests. *See, e.g.*, Ex. 1 (Miksic Dep. 77:17-20 ("They were not only my tax preparers, they were also my financial consultants as well.")). Likewise, and most crucial for this case, BGM was aware by 2007 at the latest that Miksic owned a foreign financial account. *See*  Ex. 22.

On March 17, 2010, the Internal Revenue Service (IRS) issued notices to Cortec, indicating that Miksic's wholly-owned company had been selected for examination. Ex. 44.   As the result of that examination, Miksic received notices from the IRS on January 27, 2011, October 5, 2011, and May 18, 2012, alleging that he had failed to file certain forms related to his foreign assets and accounts.

In particular, the IRS notified Miksic that he failed to file (1) Form 5471 (Information Return of U.S. Persons with Respect to Certain Foreign Corporations) (Ex. 24); (2) Form 3520 (Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts) (Ex. 51); (3) Form 3520A (Annual Information Return of Foreign Trust With a U.S. Owner) (Ex. 51); and (4) Report of Foreign Bank and

---

[2] There is some conflicting testimony regarding which CPA prepared returns for certain years.  But it is undisputed that BGM, and principally Parnell and Edmunds, prepared Miksic's returns from 2005 to 2010.

Financial Accounts (FBAR), also referred to as TD F 90-22.1 (Ex. 45) (collectively, "Delinquent Forms"). The Delinquent Forms are used by the Federal Government to assist in the fight against terrorism. *See, e.g.*, 26 U.S.C. § 6038 (statute entitled "Information reporting with respect to certain foreign corporations and partnerships").

In short, as an owner of at least two foreign corporation—EcoCortec and Cortec Hrvatska, two Croatian companies—Miksic was required to file Form 5471. As a recipient of distributions from a foreign trust—the Rust Foundation—Miksic was required to file Forms 3520 and 3520A. Finally, as an owner of various foreign bank accounts with aggregate balances exceeding $10,000, Miksic was required to file FBARs.

On May 18, 2013, Special Agents from the Internal Revenue Service's Criminal Investigation Division arrived at BGM's office with a Grand Jury Subpoena.  Ex. 5 (Edmunds Aff. ¶ 10). The Special Agents questioned Parnell and Edmunds separately regarding the unfiled Delinquent Forms, especially the FBARs.  Ex. 5 (Edmunds Aff. ¶ 11);  Ex. 4 (Parnell Aff. ¶¶ 8-9). To date, the IRS has not brought criminal charges against Miksic, but the IRS has levied significant fines against him as a result of his failure to file the Delinquent Forms.

## C.    Parnell and Edmunds Affidavits

In the course of the IRS investigation, Parnell and Edmunds provided affidavits detailing their failures to file the FBARs and to institute proper tracking and information management systems. *See* Ex. 4 (Parnell Aff. ¶ 8); Ex. 5 (Edmunds Aff. ¶ 11). The Parnell and Edmunds affidavits admit that BGM prepared and filed an FBAR for Miksic in 2006, a fact of which both affiants claimed to be unaware until the IRS investigation

4

began some three years later. Parnell explained that BGM "archived [the 2006 FBAR form] in [the] firm's electronic storage system and, thus, was overlooked in years after 2006." Ex. 4 (Parnell Aff. ¶ 8).

The affidavits also acknowledged that BGM "did not have a due date tracking system in place" to make sure required forms were timely filed. Ex. 5 (Edmunds Aff. ¶ 11). BGM compounded its negligence when Edmunds, who was in charge of preparing Miksic's tax returns, "had no communications with Miksic during the preparation of any of his tax returns." Ex. 5 (Edmunds Aff. ¶ 12). Without any communications between Edmunds and Miksic, Edmunds was unable to identify or clarify any ambiguities in Miksic's filings. Finally, Edmunds admitted that BGM was responsible for filing the FBAR and Form 5471, and failed to do so. *Id.*, ¶ 8 ("The failure to file FBARs and form 5471 with Miksic's 2007-2010 individual tax returns was the responsibility of our CPA firm and was inadvertent and unintentional on our part.").

BGM's failure to file the Delinquent Forms resulted in substantial penalties and damages to Miksic. Exs. 6, 7 (Penalty Documents).

## ARGUMENT

### I.   PLAINTIFF'S MOTION TO AMEND COMPLAINT TO SEEK PUNITIVE DAMAGES

#### A.   Amendment Standard

Rule 15(a) governs the right of a party to amend its pleadings, and provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ.

P. 15(a)(2). The Eighth Circuit has held that "amendments to pleadings should be allowed with liberality in the absence of circumstances such as undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Klipsh, Inc. v. WWWR Tech, Inc.*, 127 F.3d 729, 732 (8th Cir. 1997) (internal citations omitted); *see also Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) ("[O]nly limited circumstances justify a district court's refusal to grant leave to amend pleadings . . . .") (citation omitted). "A decision whether to allow a party to amend her complaint is left to the sound discretion of the district court . . . ." *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998).[3]

### B.    Punitive Damages Standard

The United States District Court for the District of Minnesota must "conform to the requisites of Minnesota Statutes Section 549.191 and 549.20." *Olson v. Snap Prods., Inc.*, 29 F. Supp. 2d 1027, 1034 (D. Minn. 1998). Minnesota Statute § 549.191 requires a plaintiff seeking punitive damages to obtain leave of the court.

To meet its burden, the plaintiff must make a prima facie case that the defendant acted with "deliberate disregard for the rights or safety of others." Minn. Stat.

---

[3] Significantly, Minnesota law prohibits claims for punitive damages in initial pleadings. Minn. Stat. § 549.191. Rather, punitive damages may be sought only by amendment *after* evidence to support the motion is obtained during discovery. BGM's counsel was advised of Plaintiff's intent to seek punitive damages at the last mediation before this Court on February 5, 2016 and before the non-dispositive motion deadline on March 30, 2016. The motion is timely pursuant to this Court's scheduling order. Consequently, BGM cannot argue undue delay or prejudice.

§§ 549.191, 549.20, subd. 1(a). The test for "deliberate disregard" is defined in the statute.

> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts _or_ intentionally disregards facts that create a high probability of injury to the rights and safety of others and:
>
> > (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; _or_
> >
> > (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(b) (emphasis added).

At the pleading stage, a plaintiff need not establish "entitlement to punitive damages per se, but only an entitlement to _allege_ such damages." _Ulrich v. City of Crosby_, 848 F. Supp. 861, 866 (D. Minn. 1994) (emphasis added). In a professional malpractice case, a showing of reckless disregard for the rights or safety of others is sufficient to support an award of punitive damages. _Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan_, 494 N.W.2d 261, 268 (Minn. 1992) (citing _Cobb v. Mw. Recovery Bureau Co._, 295 N.W.2d 232, 237 (Minn. 1980)); _see also Brown-Wilbert, Inc. v. Copeland Buhl & Co._, 732 N.W.2d 209, 218 (Minn. 2007) (applying legal malpractice standards to accounting malpractice analysis); _Gillespie v. Klun_, 406 N.W.2d 547, 558 (Minn. App. 1987) (affirming award of punitive damages in professional malpractice case); _Fiedler v. Adams_, 466 N.W.2d 39, 42 (Minn. Ct. App. 1991) (affirming trial

court's submission of punitive damages question to jury in professional malpractice case); *Estate of Hartz v. Nelson*, 437 N.W.2d 749, 750 (Minn. Ct. App. 1989) (affirming award of punitive damages in professional malpractice case and remanding for recalculation of punitive damages).

In evaluating the evidence presented, courts may not consider "*any* challenge, by cross-examination or otherwise, to Plaintiff's proof." *Swanlund v. Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Minn. Ct. App. 1990) (emphasis added). "Evidence submitted in opposition to the motion is not considered." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 870 F. Supp. 1499 D. Minn. 1994). The Court is "not to act as factfinder," but rather determines the whether the evidence offered in support of the motion supports a claim for punitive damages. *Olson*, 29 F. Supp. 2d at 1033 n.1.

Critically, an award of punitive damages is intended "to penalize or punish a wrongdoer and discourage him and others from engaging in similar future conduct." *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen*, 454 N.W.2d 916, 920 (Minn. 1990) (citing *Melina v. Chaplin,* 327 N.W.2d 19, 20 n.1 (Minn.1982)). Among other things, Minnesota courts consider the seriousness of the defendant's acts and the effect on the public in assessing whether punitive damages are appropriate. *Id.* (citing Minn. Stat. § 549.20, subd. 3).

The basic inquiry, then, is a two-part question focusing on what BGM should have known and what actions they took or failed to take. Thus, to succeed on this motion, Miksic must offer evidence that BGM: (1) had knowledge of **or** intentionally disregarded facts that create a high probability of injury; AND (2) acted in conscious or intentional

disregard of the high probability of injury to Miksic **or** acted with indifference to the high probability of injury to Miksic. More simply: <u>Miksic must offer evidence that BGM knew or should have known of Miksic's tax filing obligations with regard to foreign entities or accounts and that BGM acted with disregard or indifference to Miksic's interests</u>. The facts in this case easily meet that standard.

## II.    BGM'S ACTIONS CONSTITUTE MALPRACTICE

As a threshold matter, BGM committed malpractice when it failed to file Miksic's Delinquent Forms.  Plaintiffs in an accounting malpractice case must prove: (1) duty, through the existence of an accountant-client relationship; (2) breach of that duty by deviating from the applicable standard of care; (3) factual, but-for causation; (4) proximate causation; and (5) damages. *Vernon J. Rockler & Co., Inc. v. Glickman, Isenberg, Lurie, & Co.*, 273 N.W.2d 647, 650 (Minn. 1978) (citing *Christy v. Saliterman*, 179 N.W.2d 288, 293 (Minn. 1970)).

### A.    <u>BGM breached its duty of care</u>

To establish the existence of a duty, a malpractice plaintiff must show that there is an accountant-client relationship. *Vernon J. Rockler*, 273 N.W.2d at 650. BGM acted as Miksic's accounting firm for over two decades. *See, e.g.* Parnell Aff. ¶ 4. Miksic was BGM's client during the timeframe at issue and BGM owed him a duty of care. BGM has not claimed otherwise.

BGM accountants are "held to the same standard of reasonable care as lawyers, doctors, architects, and other professional people engaged in furnishing skilled services for compensation." *Vernon J. Rockler*, 273 N.W.2d at 650 (citing *Gammel v. Ernst &*

*Ernst*, 72 N.W.2d 364, 367 (Minn. 1955)). Specifically, professionals are required to "exercise that degree of care and skill that is reasonable under the circumstances, considering the nature of the undertaking." *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 817 (Minn. 2006) (quoting *Prawer v. Essling*, 282 N.W.2d 493, 495 (Minn. 1979)). Expert testimony is required to establish the standard of care. *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 266 (Minn. 1992).

CPAs Parnell and Edmunds both signed sworn affidavits admitting that they did not file their client's required forms and citing serious flaws in their firm's tracking systems that contributed to those failures.

If those affidavits alone were not enough, Miksic's accounting expert will confirm BGM's breach of duty of care. Miksic retained Arthur H. Cobb of Cobb & Associates, Ltd. as a liability and damages expert in this case. According to Cobb, BGM committed gross breaches of duty to Miksic.  Ex. 8 (Cobb Report).

CPAs who provide tax services on BGM's behalf are subject to American Institute of Certified Public Accountants (AICPA) Professional Standards, the AICPA's Statements on Standards for Tax Services (SSTSs), and Treasury Department Circular No. 230. *See* Ex. 3 (Parnell Dep. 33:11-36:6); Ex. 8 (Cobb Report at 12-14). Cobb opined that BGM breached its duty of care owed to Miksic and significantly deviated from the standard of care owed to Miksic. Cobb summarized those deviations as follows:

- Failing to exercise due professional care, to be careful, to be thorough or to obtain sufficient relevant data to prepare and file the required IRS forms for Mr. Miksic or to advise Mr. Miksic of requirements to file IRS forms;

10

- Failing to prepare and file required forms;

- Failing to timely detect and correct errors in Mr. Miksic's income tax and reporting forms;

- Failing to conduct appropriate further inquiry into Mr. Miksic's foreign holdings after receiving the IRS's audit notice to Mr. Miksic on March 17, 2010;

- Failing to conduct appropriate further inquiry into Mr. Miksic's foreign accounts and holdings after receiving the IRS's April 13, 2011 notice regarding [BGM's] failure to prepare and file a Form 5471 related to EcoCortec;

- Failing to conduct appropriate further inquiry in Mr. Miksic's foreign holdings after receiving the IRS's May 25, 2012 notice regarding [BGM's] failure to prepare and file a Form 5471 related to Cortec Croatia; and

- Failing to conduct appropriate further inquiry into Mr. Miksic's foreign holdings after receiving the IRS's Letter 3084 in the summer of 2012 regarding [BGM's] failure to prepare and file Forms 3520 and Forms 3520-A.

*Id.* at 33.

As Cobb's report makes plain, BGM categorically knew of Miksic's foreign holdings as of at least June 29, 2007. Ex. 8 (Cobb Report, at 26). Moreover, Parnell admitted unequivocally that he became aware of the Miksic's foreign account at UBS by late 2009 or early 2010. Ex. 4 (Parnell Aff. ¶ 6). Based on BGM's admissions and actions, they were patently aware of Miksic's foreign holdings.

Moreover, as set forth in Cobb's Report, BGM failed to conduct sufficient inquiry into Miksic's assets. *See* Ex. 8 (Cobb Report, at 33). Despite IRS Circular 230's requirement that an accountant conduct an adequate inquiry, Parnell never "asked Mr. Miksic if he had any personally owned [foreign] accounts." Ex. 8 (Cobb Report, at 29). Likewise, Edmunds "had no communications with Mr. Miksic during the preparation of

11

his tax returns." Ex. 5 (Edmunds Aff. ¶¶ 4, 12). With millions of dollars in penalties at stake, BGM owes its clients a thorough inquiry into their assets, rather than leaving IRS enforcement action to chance. Cobb's report confirms BGM's liability to Miksic in this case.

### B.    BGM caused Miksic's damages

Miksic, who is not a tax expert or accountant, reasonably relied on BGM in the preparation of his income taxes and ancillary documents. Moreover, reliance on an accounting or tax professional is reasonable as a matter of law:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the [accountant or] attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Ordinary business care and prudence does not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 250-251 (1985). In light of that Supreme Court holding, it follows that BGM's gross negligence and willful conduct caused Miksic damage by exposing him to significant IRS penalties. Miksic is entitled, as a matter of law, to rely completely on BGM and the advice of its professionals.

Edmunds further admits that BGM's failure to file the Delinquent Forms was the cause of the IRS's audit and the resulting penalties, which are Miksic's damages. Ex. 5 (Edmunds Aff. ¶ 4 ("…I have had responsibility for reviewing the individual and corporate federal income tax returns that were prepared by the firm for Miksic and his

entities."). These admissions further establish causation. BGM's liability in this matter is not seriously in dispute.

### III.  BGM KNEW OR SHOULD HAVE KNOWN OF MIKSIC'S TAX FILING OBLIGATIONS

Undisputedly, Miksic was a long-time BGM client. Parnell worked with Miksic and his businesses for over 18 years. BGM was responsible for and did file tax returns and accompanying schedules, statements, and forms for Miksic for many years, including 2005 to 2010. By virtue of, and through information learned and received in, those dealings, BGM undoubtedly knew or should have known of his foreign accounts and interest and should have prepared the Delinquent Forms as a result. Again, Edmunds has admitted as much: "The failure to file FBARs and forms 5471 with Mr. Miksic's 2007-2010 individual tax returns was the responsibility of our CPA firm and was inadvertent and unintentional on our part." Ex. 5 (Edmunds Aff. ¶ 8.)

Indeed, BGM does not deny that Miksic's foreign interests triggered the need to file the Delinquent Forms. Nor does it disclaim knowledge of the requirements regarding the Delinquent Forms or the consequences for failing to file them. BGM only claims it wasn't aware of Miksic's foreign interests in the first place. Ex. 4 (Parnell Aff. ¶ 9); Ex. 5 (Edmunds Aff. ¶¶ 5, 6).

To the contrary, evidence that BGM knew or should have known of Miksic's foreign interests includes, but is not limited to, the following:

1.      As early as 1988, Johnson West prepared an FBAR for Miksic in connection with his bank account at United Bank of Switzerland. Ex. 20 ("(2) Need a Form 90.22-1.").

2.      Parnell received a copy of Miksic's autobiography in approximately 1996. The book clearly discloses foreign background and interests. Ex. 3 (Parnell Dep. 67:7-9).

3.      In correspondence from Johnson West to Miksic dated November 28, 2005, Johnson West reviewed and corrected an error in the valuation of CorteCros, a Croatian entity. Ex. 26. The valuation was in Croatian currency. *Id.*

4.      BGM prepared and filed an FBAR form for Miksic's Partner Banka Croatia account for tax year 2006. Ex. 22.  And AICPA members are required to "refer to the taxpayer's returns for one or more prior years whenever possible." Ex. 43 (Statement No. 3.).

5.      On July 1, 2007 Johnson West CPA Ryan Schumacher told Cortec's controller "it is my understanding from Corey [Parnell] that Boris has interest in foreign financial accounts (foreign bank accounts)." Ex. 21.

6.      Larsen Allen business valuation materials from BGM's files dated August 15, 2007 include an extended description of EcoCortec and CorteCros. Ex. 28.

7.      Miksic's questionnaires for tax years 2007 through 2011 are completely blank. Exs. 11, 13, 14, 15.  Yet Parnell and Edmunds – who prepared Miksic's returns those years – admit they never inquired with Miksic about his foreign accounts. Ex. 4 (Parnell Aff. ¶ 9); Ex. 5 (Edmunds Aff. ¶ 12). AICPA standards require members to "make a reasonable effort to obtain from the taxpayer the information necessary to

provide appropriate answers to all questions on the return before signing as preparer" and to "not ignore the implications of information furnished" and to "make reasonable inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent either on its face or on the basis of other facts known to the member." Ex. 43. Per those standards, and certainly based on the past foreign-interest information already in its possession, BGM should have inquired with Miksic about his foreign accounts.

8.     Numerous other documents found in BGM's files and produced by BGM in this case identify EcoCortec as a foreign corporation. *See, e.g.,* Ex. 31. (October 31, 2006 and November 3, 2007, "The stockholder of the Company owns 100 percent of EcoCortec. EcoCortec is a developmental state company . . . in Belimanstria, Croatia."); Ex. 3 (Parnell Dep. 137:15-138:20); Ex. 30 (November 3, 2007 references to EcoCortec to and "balance per Cory Parnell," who knows the entity is growing significantly); Ex. 37 (November 1, 2008, EcoCortec "manufactures plastic packaging materials in Croati[a]" and Miksic is 100% owner); and Ex. 38 (December 31, 2008 reference to "rent from Croatia").

Beyond the information stored within BGM, Miksic's ties to Croatia were publicly reported and thus available to BGM had it followed its longtime client's press coverage. *See* Ex. 8 (Cobb Report, at 30 (listing publicly available articles)).

BGM cannot credibly claim it did not know, or *had no reason to know*, of Miksic's foreign interests. BGM accountants knew. And the firm's files were replete with information identifying and describing those foreign interests. But BGM plainly failed to avail itself to information within its own possession and control, and failed to inquire

with its longtime client. Such failures are no defense, and Miksic's motion should be granted.[4]

## IV.   BGM ACTED IN DISREGARD OF AND INDIFFERENCE TO MIKSIC'S INTERESTS

### A.   <u>Legal Standard</u>

Notably, "willful indifference does not imply a purpose of actually intending harm to the plaintiff." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn. 1990). Instead, a showing that BGM disregarded Miksic's interests is sufficient. *Id.* Plaintiff does not have to prove willful indifference or recklessness. Rather, the Court's review is limited to determining whether a plaintiff has made a *prima facie* case, established by clear and convincing evidence, that the defendant acted with indifference to a plaintiff's rights. *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008-09 (D. Minn. 2003) (citing *Ulrich v. City of Crosby*, 848 F. Supp. at 868). A showing of recklessness is sufficient to establish willful indifference. *Admiral Merchants*, 494 N.W.2d at 268.

*Gillespie v. Klun* is instructive. In *Gillespie*, the Minnesota Court of Appeals affirmed a award of punitive damages in a professional malpractice case. In *Gillespie*, an attorney assisted in the sale of real estate by, among other things, drafting a title opinion. *Gillespie*, 406 N.W.2d at 549-50. The attorney performed the title opinion on behalf of the buyer and seller, thereby creating an attorney-client privilege with both parties. *Id.* at 549, 555-56. After some time, the buyer and seller became adverse to one another, which established an ethical conflict for the attorney; the attorney did not withdraw from the

---

[4] The proposed Amended Complaint, and a red-line reflecting changes to the original Complaint, are attached to the Sawers Affidavit at Exhibits 46 and 47.

improper representation. *Id.* The plaintiffs brought a lawsuit for legal malpractice against the attorney based on his failure to withdraw. *Id.* at 552-53. After trial, a jury awarded the plaintiff actual damages and punitive damages. *Id.* The evidence that the attorney was aware of facts giving rise to his obligation to withdraw, coupled with his failure to withdraw, exhibited disregard for the plaintiffs' rights.

The Minnesota Court of Appeals affirmed, holding that the jury's verdict was supported by the evidence. *Id.* at 558. The plaintiffs' expert testified that once the ethical conflict arose, the attorney had a duty to withdraw immediately. *Id.*at 558-59. The attorney's continued representation of one party was an ethical conflict. *Id.* Based on that evidence, the court held that "the jury was justified in finding appellant showed willful indifference to [the plaintiffs'] rights." *Id.* at 559. Again, the similarity between *Gillespie* and this case is striking in a particularly important way: the defendant in *Gillespie* knew, or should have known, the he had a duty to withdraw and, here, BGM knew Miksic had a foreign filing obligation but failed to advise him accordingly.[5]

*In re Phar-Mor, Inc. Securities Litigation*, 892 F. Supp. 676 (W.D. Pa. 1995), also provides guidance for the Court's analysis. In *Phar-Mor*, investors in Phar-Mor, a bankrupt drugstore chain sued Phar-Mor's outside auditor for, among other things, professional malpractice. *Id.* at 683. The plaintiffs claimed that the auditor recklessly and improperly performed its audits of Phar-Mor. *Id.* The auditor, Coopers & Lybrand's ("Coopers"), allegedly failed to uncover Phar-Mor's fraud resulted in over $250 million

---

[5] Even worse, and compounding their disregard for Miksic's interests, the Delinquent Forms were not filed until years *after* BGM was put on notice of the delinquencies.

in expenses and liabilities. *Id.* at 682. The plaintiffs further claimed that, had the audits been performed properly, Phar-Mor's fraud would have been uncovered, the investors would not have purchased shares of Phar-Mor (or at least not at that price). *Id.* One of the primary questions in the case turned on whether Coopers acted recklessly to establish liability under the Securities Act of 1934. *Id.* at 684. Coopers moved for summary judgment, including dismissal of the plaintiffs' claim for punitive damages. *Id.* at 695.

The court denied Coopers' motion as it concerned punitive damages, noting that reckless conduct supports punitive damages.[6] *Id.* The court did not recount all the evidence that supported a finding that Coopers acted recklessly. Instead, the *Phar-Mor* court specifically highlighted one critical fact: Coopers ignored the results of their audit tests, which indicated a material misstatement of Phar-Mor's financial statements. *Id.* at 695. Based on the volume of improper conduct, the court submitted the punitive damages question to the jury. *Id.*

Just as Coopers had information in its files that Phar-Mor was misstating information in its financial statements, BGM absolutely knew that Miksic had a foreign filing obligation. Indeed, the Cobb Report details the considerable notice BGM had of Miksic's foreign filing obligation and their attendant reckless conduct in failing to inquire with their client or counsel him appropriately regarding that obligation.

Both *Gillespie* and *Phar-Mor* relied on a critical fact that is present here: the defendants in both cases were presented with irrefutable information that should have

---

[6] As noted above, reckless conduct likewise supports a finding of punitive damages under Minnesota law. *See Admiral Merchants*, 494 N.W.2d at 268.

raised their level of scrutiny and guided their conduct. In *Gillespie*, the attorney should have known of an irreconcilable ethical conflict but he refused to withdraw. In *Phar-Mor*, Coopers had affirmative evidence in their own files that Phar-Mor made material misstatements in its financial reports, but did not report those misstatements. Similarly, in light of the above-listed information, BGM knew Miksic had a foreign filing obligation but recklessly failed to increase its scrutiny of Miksic's IRS filings.[7]  The Court should grant Miksic's motion.

### B.    BGM's accountants are not the international tax experts they represent themselves to be

In his professional profile, to this day Edmunds holds himself out as an International Taxation expert.[8] That representation, however, is false: Edmunds admitted unequivocally that he is not an expert in International Taxation.[9] Ex. 2 (Edmunds Dep. 14:20-15:9 ("Q: So you don't consider yourself an expert in international taxation? A:

---

[7] Miksic appealed the IRS penalties and sanctions on the grounds that the failure to file "was due to reasonable cause and not willful neglect."  Ex. 6, at Miksic004246. This is the standard provided by statute to justify abatement of the penalties and sanctions. *Id.* Significantly, the IRS *rejected* Miksic's arguments and held that the failure to file was *not* due to reasonable cause and *was* due to willful neglect.  *Id.* The finding by the IRS that the failure to file was due to "willful neglect" is justification by itself to allow Miksic to seek punitive damages.  But there is much more beyond this unassailable and fatal fact, as described herein.

[8] *See* Ex. 9 (www.bgm-cpa.com/edmunds.htm).

[9] For example, even after the events giving rise to this lawsuit, Edmunds cannot cogently explain the circumstances under which a taxpayer must file Forms 3520, 3520A, or an FBAR. Ex. 2 (Edmunds 41:12-21; 39:18 ("Q: And what triggers [an FBAR's] filing? A: If you have an account at a foreign institution in excess of $10,000. Q: Per account, per institution or in aggregate? A: I'm not sure. Q: How long have the FBAR rules been in effect? A: I'm not sure.")).

No.")). Misrepresentations related to ability to provide professional services can be sufficient to support an award of punitive damages. *See Huckestein Mechanical Services., Inc. v. IC Staffing Solutions., LLC*, No. Civ. A. 13-479, 2014 WL 3845825 (W.D. Pa. July 23, 2014).

In *Huckstein Mechanical*, plaintiff sued defendant alleging, among other things, professional malpractice. *Id.* at *1. Defendant was a temporary staffing agency providing personal accounting services. *Id.* Defendant placed an individual on-site at Huckstein to provide assistance with "managing cash and handling accounts payable, accounts receivable and data entry accounting functions." *Id.* at **2-3. Defendant overstated the individual's accounting abilities, stating that he was a certified public accountant who was more "accounting savvy" than prior employees; but the employee was not a CPA, nor was he skilled in accounting. *Id.* at *3, *7. The plaintiff alleged that defendant placed an incompetent individual and misrepresented the employee's accounting abilities. *Id.* at *1. The court denied the defendants' summary judgment motion, allowing the claim for punitive damages to go forward. *Id*. at *15.

Edmunds's profile on BGM's web-site represents that "International Taxation" is an "Area of Expertise" for him. Ex. 9.  But like the accountant in *Huckstein*, Edmunds's abilities are not as advertised.

Beyond Edmunds, when BGM as a firm is confronted with an issue touching on international taxation, BGM refers the work to another accountant. *See* Ex. 2 (Edmunds Dep. 28:7-14 ("Q: So where did you go if you needed help with international accounting? A: We used Jim Loizeaux who was at Grant Thornton.")); Ex. 3 (Parnell Dep. 28:7-29:23

("Q: So if you had a client who had foreign corporations or had interests in foreign countries or had foreign bank accounts, was Johnson West capable of handling that kind of work? [Objection from counsel] A: We normally would reach out to other firms, Grant Thornton, Baker Tilly, BDO, which is an affiliation.")).

Despite BGM's inability to provide competent advice on issues related to international tax or to provide advice to clients "who had foreign corporations or had interests in foreign countries or had foreign bank accounts," BGM never advised Miksic that they were unqualified to complete his complex tax returns. Ex. 2  (Edmunds Dep. 41:22-42:3 ("Q: Did you ever advise Miksic that you were unqualified to do his tax returns? A: Did I initiate a phone call with him to tell him that I was unqualified? Q: Yes. A: No.")); Ex. 3 (Parnell Dep. 31:14-16 ("Q: Did you ever tell Miksic that Johnson West was not qualified to do his tax returns? A: No.")). And BGM never referred Miksic to, or consulted with, an outside international tax expert for assistance with Miksic's tax preparation issues. Ex. 2 (Edmunds Dep. 28:7-22).

### C.    BGM's system defaults to negative answers to key inquiries, putting clients like Miksic at risk of incomplete returns and IRS penalties

As a part of Miksic's tax returns, BGM prepared Schedules A and B to Form 1040. *See, e.g.*, Ex. 16. Schedule B of Form 1040 contains a set of questions regarding foreign accounts. Ex. 16 at BGM000319. Specifically, the following questions are relevant:

> 7a.    At any time during 2008, did you have an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for [FBARs].

21

7b.     If "Yes," enter the name of the foreign country: _____

8.      During 2008, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See page B-2.

*Id.* Answers to these questions are crucial flags for tax preparers to further inquire regarding a client's foreign filing obligations. According to Edmunds, BGM's tax software automatically defaults unanswered questions to "no." Ex. 5 (Edmunds Aff. ¶ 12).

In connection with Miksic's 2005 tax return, BGM checked the "no" box for Schedule B, Questions 7a and 8. Ex. 49. Question 8 is answered "no," which is inaccurate. *Id.*

In connection with Miksic's 2006 tax return, BGM checked the "no" box for Schedule B, Questions 7a and 8. Ex. 50. Question 8 is answered "no," which is inaccurate. *Id.*

In connection with Miksic's 2007 tax return, BGM failed to file the Delinquent Forms. Ex. 2 (Edmunds Dep. 47:21-48:2). BGM checked the "no" box for Schedule B, Questions 7a and 8. Ex. 12. Question 8 is answered "no," which is inaccurate. *Id.*

In connection with Miksic's 2008 tax return, BGM failed to file the Delinquent Forms. Ex. 2 (Edmunds Dep. 71:5-74:6). Significantly, failing to file the Delinquent Forms was even more reckless because the 2008 tax return responded in the affirmative to Question 7a, regarding Miksic's ownership of a foreign account with a balance in

excess of $10,000 and the answer to Question 7b identifies Croatia as the country. Ex. 16. Question 8 is marked "no," which is inaccurate. *Id.*

In connection with Miksic's 2009 tax return, BGM failed to file the Delinquent Forms. Ex. 2 (Edmunds Dep. 76:10-77:11). As with the 2008 return, there is an error with regard to Questions 7 and 8. Question 7a is marked "yes," and 7b identifies the country as "Croatia." Ex. 17. With respect to Question 8, relating to Forms 3520 and 3520A, however, the check box is blank. *Id.* Despite Edmunds admitting that he reviewed the 2009 return, he was unable to explain why Question 8 was completely blank. Ex. 2 (Edmunds Dep. 76:23-77:11).

Finally, in connection with Miksic's 2011 tax return, even though BGM correctly identified Miksic's foreign filing obligation, BGM failed to accurately respond to Questions 7 and 8, answering them both in the negative. *Id.* Miksic's 2011 tax return was filed in 2012. Ex. 18. The IRS commenced its audit of tax returns in January 2011 and BGM was undeniably aware of that audit and should have applied increased analysis and scrutiny to all of Miksic's foreign filings.[10] *See, e.g.*, Ex. 24.

As a result of BGM's glaring failures, the IRS ultimately considered bringing criminal charges against Miksic.[11] *See* Ex. 4 (Parnell Aff. ¶ 7 (describing his meeting with Special Agents from the Internal Revenue Service's Criminal Investigation Division

---

[10] Egregiously, BGM, by its own admission, continued to fail to fulfill its obligation to file Form 5471 on Miksic's behalf, exposing Miksic to significant additional penalties. Exs. 35, 36.

[11] The prospect of criminal charges was so traumatic Miksic collapsed in his lawyer's Florida office on September 2, 2014, and had to be taken to the emergency room. Ex. 48.

after they produced a Grand Jury Subpoena)). Despite that catalogue of resulting problems, Edmunds would not do anything differently. *See* Ex. 2 (Edmunds Dep. 111:6-11). Notably, BGM has an entire list of other clients who may be obligated to file an FBAR. *See* Ex. 34.

### D.    BGM has made no effort to correct its deficient procedures

Parnell, BGM's Chief Executive Officer and member of the Board of Directors, and Edmunds, a manager of BGM's Tax Group, are unaware of any material changes to their policies to ensure that BGM does not harm its clients in the future. *See* Ex. 3 (Parnell Dep. 20:20-22:6). The only change Edmunds could recall is that BGM now requires a client to fill out a questionnaire and, if they do not fill out a questionnaire, they consider whether BGM should withdraw from its engagement. Ex. 2 (Edmunds Dep. 16:25-19:12). BGM has not updated or acquired new software systems or enacted other material changes to its policies. *See* Ex. 3 (Parnell Dep. 22:2-6 ("Q: Since this lawsuit was filed in 2014 or 2015, has the firm purchased any new software systems to address any of the issues raised in the lawsuit? A: No.")). While BGM has a software system in place now, Ex. 3 (Parnell Dep. 22:7-11), that software system did not prompt BGM to file the Delinquent Forms on Miksic's behalf and is likely insufficient to prevent the same from happening again.

In sum, BGM misrepresents its accountants' expertise, failed to disclose to Miksic that lack of expertise, and refuses to correct the deficient procedures that contributed to Miksic's incomplete tax returns and concomitant IRS prosecution and penalties. Based on that quantum and quality of record evidence, Miksic has established by clear and

convincing evidence that BGM's actions evince a willful indifference to not only Miksic's rights, but to the rights of taxpayer-clients who come after him. Miksic's motion should be granted.

## **CONCLUSION**

BGM have known that Miksic had a foreign filing obligation since 1988. BGM have been fully involved in Miksic's finances for nearly three decades. Despite that involvement, BGM recklessly failed to comply with their professional standards. This is prima facie evidence that Miksic is entitled to seek punitive damages. Miksic's motion to amend his complaint should be granted.


Dated: March 31, 2016                        By: s/Gregory J. Stenmoe
                                                  Gregory J. Stenmoe
                                                  Britt M. Gilbertson
                                                  Michael M. Sawers
                                             Bar Number 131155
                                             Bar Number 034977X
                                             Bar Number 392437
                                             Attorneys for Plaintiff Boris A. Miksic
                                             Briggs and Morgan, P.A.
                                             2200 IDS Center
                                             80 South Eighth Street
                                             Minneapolis, Minnesota 55402-2157
                                             Telephone: (612) 977-8400
                                             Fax: (612) 977-8650
                                             gstenmoe@briggs.com
                                             bgilbertson@briggs.com
                                             msawers@briggs.com

7575506v15