## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Boris A. Miksic,                                        Court File No. 15-cv-00539-JRT-BRT

        Plaintiff,

    v.

Boeckermann Grafstrom Mayer, LLC, a    **MEMORANDUM IN OPPOSITION TO**
Minnesota limited liability company, f/k/a    **DEFENDANTS' MOTION FOR**
Johnson, West & Co. P.L.C., Boeckermann    **SUMMARY JUDGMENT**
Grafstrom Mayer, P.A., and Johnson West
& Co. P.L.C.

        Defendants.

## INTRODUCTION

In this accounting malpractice suit, Defendants Boeckermann Grafstrom Mayer, LLC, a Minnesota limited liability company, f/k/a Johnson, West & Co. P.L.C., Boeckermann Grafstrom Mayer, P.A., and Johnson West & Co. P.L.C. (collectively, "Defendants"), acknowledge that "the failure to file FBARs and form 5471 with [Plaintiff Boris A.] Miksic's 2007-2010 individual tax returns was the[ir] responsibility [] and was inadvertent and unintentional on [their] part." Defendants' expert witness, Todd F. Taggart, testified as to at least four discrete negligent acts. Understandably, given the evidence against them, Defendants do not contest that they breached the standard of care owed to Miksic. Instead, they seek summary judgment based on a litany of purported technical defenses, each of which lacks support and should be rejected.

First, contrary to Defendants' claims, the statute of limitations on Miksic's malpractice claim began to run when the Internal Revenue Service levied penalties

against Miksic on January 27, 2011. Until then, Miksic had suffered **no** damage and, therefore, could not have stated a professional malpractice claim. His claim is timely.

Second, Defendants suggest that Miksic failed to comply with statutory expert review certification requirements by providing an insufficient Second Affidavit of Expert Review ("Second Affidavit"). Miksic plainly provided the statutorily-required expert identification, the substance of his opinions, and a summary of the grounds for those opinions. Defendants' dismissal request is contrary to the plain language of Minn. Stat. § 544.42, subd. 4, which requires the Court to issue an order identifying any deficiencies in the Second Affidavit and allowing Miksic an opportunity to cure the deficiencies.

Third, as set forth more fully in Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude Arthur Cobb, Plaintiff's expert witness is demonstrably qualified and his testimony is not subject to exclusion.

Fourth, Defendants' affirmative defenses of "*in pari delicto*" and laches do not carry the day. As Defendants' own sworn affidavits admit, preparation of the forms at issue in this case was their responsibility. Their failure to do so establishes a per se deviation from the applicable standard of care which negates any defense of "*in pari delicto*." And laches is inapplicable as a matter of law because Miksic's legal claims are governed by a statute of limitations. *Aronovitch v. Levy*, 56 N.W.2d 570, 573-74 (Minn. 1953).

Finally, Defendants' attempt to chip away at Miksic's damages at summary judgment will fail. Miksic is entitled to seek damages to rectify his IRS FBAR penalties. Miksic's malpractice suit is, in part, an attempt at mitigating the millions of dollars in

damages Miksic incurred as a result of Defendants' negligence. Accordingly, Miksic's attorneys' fees in this matter are recoverable.

The Court should deny Defendants' motion and set this case for trial.

## FACTUAL BACKGROUND

### A.    The Parties

Boris Miksic is a Croatian-American entrepreneur who lives in the United States. Affidavit of Michael M. Sawers, Ex. 1, at 14 (Deposition Transcript of Boris A. Miksic, hereinafter cited as "Miksic D.[##]").[1] English is Miksic's second language. Miksic D.14. Miksic owns various American and Croatian companies. *See* Miksic D.19-20; 28-32. Among others, Miksic owns Minnesota-based Cortec Corporation, of which he is the sole shareholder, and EcoCortec based in Croatia. *Id.* Miksic D.19-20. Over 25 years ago, Miksic retained BGM as his certified public accountants (CPAs); BGM performed services for Miksic individually as well as Cortec. Miksic D.49; 50. Originally, he retained Defendant Johnson West as his accountants; BGM and Johnson West merged in 2012. Miksic D.49; 50; Ex. 7.

When Miksic first retained Defendants, his primary CPA was Clifford Lozinski. Lozinski retired in 2006[2] and CPA Cory Parnell, of Johnson West and later BGM, assumed primary responsibility for Miksic's accounting and tax services. Ex. 8, ¶4 (hereinafter cited as "Edmunds Aff."). Parnell worked with Miksic for approximately eighteen years. Ex. 9, ¶4 (hereinafter cited as "Parnell Aff."). CPA Corey Edmunds, of

---

[1] Unless otherwise specified, all Exhibits cited in this memorandum are attached to the Sawers Aff., and shall be cited as "Ex. ___."
[2] Lozinksi passed away on March 16, 2014.

Johnson West and later BGM, also took on a substantial role in providing Miksic accounting and tax advice and services. Edmunds Aff. ¶4.

### B.    The Delinquent IRS Forms

On March 17, 2010, the Internal Revenue Service (IRS) issued notices to Cortec, indicating that Miksic's wholly-owned company had been selected for examination. Ex. 10.

As a result of the Cortec audit, the IRS notified Miksic that he, as an individual, failed to file various forms pertaining to his foreign interests, including (1) Form 5471 (Information Return of U.S. Persons with Respect to Certain Foreign Corporations) (Ex. 11); (2) Form 3520 (Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts) (Ex. 12); (3) Form 3520A (Annual Information Return of Foreign Trust With a U.S. Owner) (Ex. 12); and (4) Report of Foreign Bank and Financial Accounts (FBAR), also referred to as TD F 90-22.1 (Ex. 13) (collectively, "Delinquent Forms"). The Delinquent Forms are used by the Federal Government to assist in the fight against terrorism. *See, e.g.*, 26 U.S.C. § 6038 ("Information reporting with respect to certain foreign corporations and partnerships").

As an owner of foreign corporations, Miksic was required to file Form 5471, but BGM failed to do so on his behalf. Miksic received his Form 5471 penalty notice on January 27, 2011. Ex. 11. As a recipient of distributions from a foreign trust—the Rust Foundation—Miksic was required to file Forms 3520 and 3520A, but BGM failed to do so on his behalf. Miksic received his Form 3520 and 3520A penalty notice on May 18, 2012. Ex. 12. Finally, as an owner of various foreign bank accounts with aggregate

4

balances exceeding $10,000, Miksic was required to file FBARs, but BGM failed to do so on his behalf. Miksic received his FBAR penalty notice on October 5, 2011. Ex. 13.

Following the Delinquent Form penalty notices, on May 18, 2013, Special Agents from the IRS's Criminal Investigation Division arrived at BGM's office with a Grand Jury Subpoena. Edmunds Aff. ¶10. The Special Agents questioned Parnell and Edmunds separately regarding the unfiled Delinquent Forms, especially the FBARs. Edmunds Aff. ¶11; Parnell Aff. ¶¶8-9. To date, the IRS has not brought criminal charges against Miksic, but the IRS has levied significant fines against him as a result of his failure to file the Delinquent Forms, as follows:

| Tax Year | Delinquent Form Filing Deadline | Date of Penalty From IRS | Deficiency Type | IRS Penalties |
|---|---|---|---|---|
| 2005 | June 30, 2006 | October 5, 2011[3] | FBAR | $152,188 |
|  |  | Forms 5471: January 27, 2011[4]; Forms 3520/3520A: May 18, 2012[5] | Forms 5471, 3520, 3520A | $38,026 |
| 2006 | June 30, 2007 | October 5, 2011 | FBAR | $175,805 |
|  |  | Forms 5471: January 27, 2011; Forms 3520/3520A: May 18, 2012 | Forms 5471, 3520, 3520A | $51,313 |

[3] Ex. 13.
[4] Ex. 11.
[5] Ex. 12.

| 2007 | June 30, 2008 | October 5, 2011 | FBAR | $477,448 |
|------|------|------|------|------|
|  |  | Forms 5471: January 27, 2011; Forms 3520/3520A: May 18, 2012 | Forms 5471, 3520, 3520A | $121,394 |
| 2008 | June 30, 2009 | October 5, 2011 | FBAR | $356,119 |
|  |  | Forms 5471: January 27, 2011; Forms 3520/3520A: May 18, 2012 | Forms 5471, 3520, 3520A | $378,214 |
| 2009 | June 30, 2010 | October 5, 2011 | FBAR | $135,438 |
|  |  | Forms 5471: January 27, 2011; Forms 3520/3520A: May 18, 2012 | Forms 5471, 3520, 3520A | $20,356 |
| 2010 | June 30, 2011 | October 5, 2011 | FBAR | $107,864 |
| **Total** |  |  |  | $2,014,165[6] |

### C.    Defendants Knew About Miksic's Foreign Holdings

Defendants performed tax services for Miksic for over two decades. Miksic D.49. During the parties' relationship, Lozinski became Miksic's longtime CPA, financial advisor, and friend. Miksic D.101-102. During the course of the parties' relationship, Defendants became intimately aware of Miksic's financial, familial, and business

_____

[6] Ex. 14, at MIKSIC-003795; Ex. 15, at MIKSIC-003857.

interests. For example, Defendants performed audit services for Miksic's wholly-owned company, Cortec, and other companies. Ex. 4, at 115 (Deposition Transcript of Todd Taggart, hereinafter cited as "Taggart D.[##]"). Parnell was trustee for a trust established for Miksic's parents, who are Croatian citizens who reside in Croatia. Ex. 16 at BGM020595. Miksic also granted Parnell power of attorney.[7] Ex. 17. Parnell and Lozinski even went on a fishing trip to Florida with Miksic in 2005. Ex. 2, at 63 (Deposition Transcript of Cory Parnell, hereinafter cited as "Parnell D.[##]"). Parnell was also aware that Miksic had a personal assistant, Ivana Borsic, who moved back to Croatia and continued to do work for Miksic from there. Parnell D.64-65. These examples show some of the ways in which Defendants became aware of Miksic's personal and business interests.

In addition to knowledge of Miksic's personal and business interests, Defendants had specific, actionable knowledge regarding Miksic's foreign businesses and financial accounts. For example, Defendants filed an FBAR for Miksic in 1988. Ex. 18. Defendants also filed an FBAR for Miksic for tax year 2006, in 2007. Ex. 19. On Miksic's 2008 and 2009 Form 1040s, which Defendants prepared, Defendants acknowledged that Miksic had foreign accounts in Croatia, but inexplicably failed to prepare any Delinquent Forms. Exs. 20, at BGM000319; 21, at BGM019947. In connection with their preparation of financial statements for Miksic's wholly-owned company, Cortec Corporation, Defendants included the following note, dated November

---

[7] A power of attorney imposes a higher duty upon agent. *See* Minn. Stat. § 523.21 (requiring the agent to "have the interests of the principal utmost in mind").

1, 2008: "The stockholder of the company owns 100% of EcoCortec. EcoCortec is a…company that manufactures plastic packaging materials in Belimnastria, Croatia. Operations of EcoCortec commenced in May 2007." Ex. 3, at 90 (Deposition Transcript of Corey Edmunds, hereinafter cited as "Edmunds D.[##]"); Ex. 27.

Finally, Defendants reviewed the valuation of CortecCros, one of Miksic's Croatian companies in 2005. Ex. 22. The valuation was in Croatian currency. *Id.* In July 2007, Defendants contacted McGillivray and said "it is my understanding from [Parnell] that Boris has interest in foreign financial accounts (foreign bank accounts). Ex. 23.

### D. **Defendants' Tax Preparation Process**

Lozinski was primarily responsible for Miksic's return for tax year 2006; Parnell was responsible for tax year 2007 (Parnell Aff. ¶4); and Edmunds was responsible for tax years 2008 through 2010 (Edmunds Aff. ¶5).[8] Edmunds D.47; 71; 74; 79. According to Defendants, their established tax preparation procedures included (1) review of "previous year's tax documents for accuracy"; (2) a determination whether "any additional information was needed from the client"; (3) ensuring that "the reviewer was satisfied that all tax questions had been answered"; (4) partners having "follow-up conversations with the client"; and (5) "three levels of CPAs reviews [sic] from preparers, reviewers, and the relationship partner." Defs.' Br. 7-8. Defendants failed to comply with their own procedures and breached their duties to Miksic.

---

[8] There is some conflicting testimony regarding which CPA prepared returns for certain years. But it is undisputed that BGM, and principally Parnell and Edmunds, prepared Miksic's tax returns from 2005 to 2010.

Every year, Defendants sent an engagement letter and a "Tax Organizer," or questionnaire, to Miksic. Exs. 24, 32, 33, 34, 35. Edmunds D.84; Taggart D.67; 71-72. Miksic typically did not return signed engagement letters. Exs. 24, 32, 33, 34, 35. For the years in question, Miksic returned an engagement letter only for tax year 2007. Ex. 24. Yet Defendants undertook representation of Miksic despite not receiving signed engagement letters.[9] Taggart D.62-64. Mikisc did not return completed questionnaires for the years at issue. Taggart D.71-72. Defendants' tax preparation software inexplicably automatically defaulted to a "no" answer on his tax returns for questions relating to Miksic's foreign interests. Edmunds Aff. ¶12. Defendants did not follow up with Miksic regarding his blank questionnaires or regarding the default "no" answers that contradicted BGM's long-standing knowledge of Miksic's affairs. Taggart D.71-72. According to BGM, the firm "did not have a due date tracking system in place" to make sure required forms were timely filed. Edmunds Aff. ¶11. Neither Parnell nor Edmunds ever asked Miksic if he had any foreign accounts. Parnell Aff. ¶9; Edmunds Aff. ¶12.

Defendants did not communicate with Miksic very much, if at all, during the preparation of Miksic's tax returns. For example, there is no documentary evidence that Defendants ever sought to fill in gaps in information from 1988 to 2009 regarding Miksic's foreign holdings. Taggart D.80. In fact, according to Defendants, the responsible CPAs did not communicate effectively with Miksic at all during the tax

---

[9] Failing to obtain a signed engagement letter results in exposing the tax preparer to "unknown liability." Taggart Rpt.11. According to Taggart, Defendants should have declined the representation of Miksic until they received a signed engagement letter. Taggart D.66.

preparation process. Edmunds Aff. ¶12. Defendants admit they did not review Miksic's previous tax return. *See* Edmunds D.49-52.

### E.   Defendants' Expert Opines That Defendants Deviated From the Applicable Standard of Care

Defendants' expert, Taggart, opined that Defendants deviated from the standard of care in a number of ways.

First, Defendants should have "follow[ed] up" with Miksic to get critical information necessary to complete Miksic's tax returns, including information about Miksic's foreign filing obligations. Taggart D.86. According to Taggart, Defendants "could have done more" to confirm Miksic's foreign holdings, as required by the professional standards that govern Defendants' conduct. Ex. 25, at 6 (hereinafter cited as "Taggart Rpt.[##]").

Second, Defendants' expert further explained it was Defendants' professional obligation to research "incorrect, incomplete, or inconsistent" information. Taggart D.52-55. In fact, "an accounting professional cannot rely on no information." Taggart D.72. Critically, a high level of communication with Miksic should have been a priority to Defendants; Taggart testified that the FBAR was "a difficult form for taxpayers to be compliant with." Taggart D.40. Miksic hired professional CPAs precisely because the Internal Revenue Code and the attendant regulations are tens of thousands pages of dense legal requirements. *See* Taggart D.17-18; Miksic D.111. Despite all of that, Defendants did not communicate with Miksic about any of the incomplete or missing information

they received. Edmunds Aff. ¶12; Parnell Aff. ¶9. Taggart testified that not talking to the client during the tax year is "rare." Taggart D.32.

Third, according to Taggart, Defendants deviated from the standard of care with respect to preparing Form 5471 and Miksic's ownership interest in EcoCortec—one of Miksic's Croatian companies. Taggart D.112. ("I believe that they should have done more relative to the preparation of Forms 5471 with respect to EcoCortec."). The information related to Miksic's ownership of Croatia-based EcoCortec was in Defendants' own files. Exs. 26, 27, 28; Parnell D.101.

Fourth, despite filing an FBAR for 2006, Defendants failed to do so in **<u>all</u>** subsequent years. Edmunds Aff. ¶¶7-8. According to Taggart and applicable professional standards, CPAs are required to review the previous year's tax filings when preparing current year filings. Taggart D.24-26, 52-55. Taggart believes Defendants were negligent in failing to review Miksic's 2006 tax return. Taggart D.81 ("I believe that with respect to the 2007 year they should have, based on a prior–a review of the prior year return, they should have inquired as to whether foreign accounts existed in 2007.").

Fifth, for Miksic's 2008 and 2009 returns, Defendants marked Miksic's Form 1040 "Yes," in response to the question that asks whether the taxpayer has any foreign accounts in excess of $10,000, but filed no FBARs. Taggart D.112 ("I believe that they should have pursued the incongruity in the FBAR questions in the 2008 and '09 returns, where an answer of 'Yes' was indicated as to foreign accounts, and the word 'Croatia,' but no FBARs were prepared."). In fact, Defendants even correctly identified "Croatia" as the proper country of Miksic's foreign accounts. Taggart D.112; Exs. 20, 21. Despite

11

recognizing Miksic's foreign filing obligation on his Form 1040, Defendants failed to prepare other documents related to Miksic's foreign filing obligations or otherwise advise him to file the Delinquent Forms. Taggart D.112.

At base, Taggart admits that Defendants "could have done more to comply with applicable professional standards[.]"[10] Taggart Rpt. 6, 7, 19. Defendants plainly deviated from the applicable standard of care in preparing Miksic's tax returns failing to file the Delinquent Forms.

### F.   The Parnell and Edmunds Affidavits

If the testimony of Defendants' own expert were not enough to establish malpractice, one need only consult Parnell's and Edmund's own words.[11]

In the course of the IRS investigation, Parnell and Edmunds provided affidavits detailing their failures to file the FBARs and to institute proper tracking and information management systems. *See* Edmunds Aff. ¶11. The Parnell and Edmunds affidavits admit that BGM prepared and filed an FBAR for Miksic in 2006, a fact of which both affiants claimed to be unaware until the IRS investigation began some three years later. Parnell explained that BGM "archived [the 2006 FBAR form] in [the] firm's electronic storage system and, thus, was overlooked in years after 2006." Parnell Aff. ¶8.

The affidavits also acknowledged that BGM "did not have a due date tracking system in place" to make sure required forms were timely filed. Edmunds Aff. ¶11.

---

[10] Miksic's expert, Arthur H. Cobb, agrees that Defendants breached the standard of care owed to Miksic in a multitude of ways. Ex. 29, at 33 (hereinafter cited as "Cobb Rpt.[##]").

[11] Also, the Verified Complaint itself is a sworn statement that establishes questions of fact.

Edmunds, who was in charge of preparing Miksic's tax returns, "had no communications with Miksic during the preparation of any of his tax returns." *Id.*, ¶12. Without any communications between Edmunds and Miksic, Edmunds was unable to identify or clarify any ambiguities in Miksic's filings. Finally, Edmunds admitted that BGM was responsible for filing the FBAR and Form 5471, and failed to do so. *Id.*, ¶8. ("The failure to file FBARs and form 5471 with Miksic's 2007-2010 individual tax returns was the responsibility of our CPA firm and was inadvertent and unintentional on our part.").

## G.   <u>Procedural Posture</u>

Miksic sued Defendants on November 24, 2014, in Minnesota District Court. *See Miksic v. Boeckermann Graftsrom Mayer, LLC*, Civ. No. 0:14-cv-5047 (DWF/TNL) (Notice of Removal, ECF No. 1-1). Defendants removed Miksic's complaint to this Court on December 22, 2014. The parties entered into a stipulation of facts and a tolling agreement on February 13, 2016. Ex. 30. The parties stipulated for dismissal of the first complaint on February 17, 2016, and the complaint was dismissed without prejudice on February 18, 2015. The parties stipulated to a number of facts, including that a subsequently filed lawsuit would relate back to November 24, 2014. *See* Ex. 30. Miksic commenced this lawsuit on February 18, 2015.

## H.   <u>Mikisc's Second Affidavit of Expert Review</u>

Discovery in this case began on April 29, 2015. The original Pretrial Scheduling Order required expert identification by February 29, 2016 and the initial expert report by March 14, 2016. ECF No. 11. The Scheduling Order was later amended by joint

stipulation to extend the expert identification deadline to March 4, 2016 and the initial expert report deadline to April 1, 2016. ECF No. 19.

Miksic served his Second Affidavit of Expert Review ("Second Affidavit") on August 17, 2015, within 180 days of the commencement of discovery, and over seven months before the expert report deadline. 7/22/16 Decl. of Michael Berger, Ex. 7. The nine-page Second Affidavit identifies Arthur H. Cobb, CPA, President of Cobb & Associates, Ltd. as an expert witness and states that it would set out the relevant facts and opinions, as well as "a summary of the grounds for each opinion" pursuant to Minn. Stat. § 544.42, subd. 4. *Id.* ¶3. It further provides that "Miksic will provide a more complete expert report as required by the Court's Pretrial Scheduling Order" and "the facts and grounds for Cobb's opinions and Cobb's opinions may change through the course of discovery and analysis." *Id.* ¶4.

### 1.    Standard of care

Under the heading "Applicable Standard of Care," the Second Affidavit states that Defendants were bound by the American Institute of Certified Public Accountants ("AICPA") Professional Standards as well as the AICPA's Statements on Standards for Tax Service ("SSTS"). *Id.* ¶8. In particular, the Second Affidavit cites six specific SSTS[12], six specific provisions of the AICPA Code of Professional Conduct[13], and six

---

[12] "SSTS No. 1 (Tax Return Positions); SSTS No. 2 (Answers to Questions on Returns); SSTS No. 3 (Certain Procedural Aspects for Preparing Returns); SSTS No. 5 (Departure from a Position Previously Concluded in an Administrative Proceeding or Court Decision); SSTS No. 6 (Knowledge of Error: Return Preparation and Administrative Proceedings); SSTS No. 7 (Form and Content of Advice to Taxpayers)." *Id.* ¶8.

Treasury Department Circular No. 230 requirements[14] with which Defendants were required to comply. Pursuant to those obligations and others that would be described in Cobb's future expert report, "Defendants were responsible to provide services with the exercise of due professional care, obtain sufficient relevant data, adhere to best practices, promptly advise Miksic of the fact of noncompliance, error, or omission and be knowledgeable and thorough." *Id.* ¶10.

### 2.    **Breach of standard of care**

The Second Affidavit states that Defendants deviated with the standard of care in a multitude of ways, including the following:

1.    "Defendants did not prepare or file FBARs on Miksic's behalf or advise Miksic to file FBARs" although they had prepared Miksic's FBAR for 2006. *Id.* ¶12 & n.3.

2.    "Defendants failed to make a reasonable inquiry or otherwise obtain sufficient relevant data to provide appropriate answers to all questions on the return and to determine Miksic's need to file FBARs." "Such inquiry should have included, among other things":

   a.    "referring to Miksic's returns for one or more prior years (for example: Miksic's returns for 2006 were stored in Defendants' own files), as required by the Standard of Care (including the AICPA Statements on Standards for Tax Services No. 2 and No. 3);"

   b.    "establishing the facts, including regarding the extended client and all related entities through inquiring directly with Miksic as to financial and business activities, financial interests outside of the United States, foreign bank accounts and controlled foreign business entities; and"

---

[13] "0.300.60; 1.100.001; 1.130.020; 1.300.001; 1.300.101; 1.400.040." *Id.*, ¶8.

[14] "§ 10.21 (Knowledge of client's omission); § 10.22 (Diligence as to accuracy); § 10.33 (Best practices for tax advisors); § 10.34 (Standards with respect to tax returns and documents, affidavits and other papers); § 10.35 (Competence); and § 10.36 (Procedures to ensure competence)." *Id.* ¶9.

      c.     "following up with Miksic if there was any question as to a potential omission or failure to file required forms, including FBARs and Form 5471." *Id.* ¶12.

3.     Regarding the Rust Foundation, Defendants failed to:

      a.     "identify Miksic's creation of, a transfer to, or distributions from the foreign trust"

      b.     "prepare or file Forms 3520 and 3520A on Miksic's behalf or advise Miksic to file Forms 3520 and 3520A."

      c.     "make reasonable inquiry into Miksic's financial and business activities, background, interests, and holdings." *Id.* ¶15.

4.     Defendants' electronic data tracking system created an undue risk by automatically defaulting the response to unanswered questions to "no" rather than "require a follow-up answer to ensure provision of appropriate answers to all questions on the return and that the returns and accompanying schedules and statements are true, correct, and complete." *Id.* ¶16.

Moreover, "Cobb concurs with Edmunds' statement that 'The failure to file FBARs and forms 5471 with Miksic's 2007-2010 individual tax returns was the responsibility of our CPA firm.'" *Id.* ¶13 (quoting Edmunds Affidavit). The Second Affidavit also concluded that Parnell and Edmunds Affidavits themselves "constitute an admission of breaches of the Standard of Care." *Id.* ¶14.

Finally, the Second Affidavit does not purport to contain a full catalog of Defendants' breaches. "These failures are only a summary, as required by Minnesota Statute, of some of the known failures to date. As discovery continues in this matter, it is expected that the number and type of failures will increase and diversify." *Id.* ¶17.

### 3.    **Causation**

The Second Affidavit next relays Cobb's opinion that "Defendants' deviations from the applicable Standards of Care set out above directly and proximately caused Miksic damage." *Id.* ¶18. Such failures commonly trigger IRS scrutiny and associated fees, expenses, penalties, and assessments. *Id.* Defendants caused the damage, the Second Affidavit reasons, because Miksic would not be expected to know of the form filing requirements, and in fact was unaware that the requisite forms had not been filed until he received IRS notification. *Id.* ¶21. It was reasonable for Miksic to rely on his accountants to file the requisite forms, particularly where the various forms had been filed in the past. *Id.* Defendants' failures caused damages and Miksic "would not have incurred these damages had Defendants provided professional services in accordance with applicable Standards of Care." *Id.* ¶19.

### 4.    **Damages**[15]

Defendants' deviations from the applicable Standards of Care in the course of the accountant-client relationship with Miksic caused Miksic "to incur significant damages, including but not limited to penalties and interest assessments from the IRS, as well as costs, fees, and expenses." *Id.*

The parties engaged in extensive discovery in the months following service of the Second Affidavit, including four depositions, written discovery, and the exchange of tens of thousands of pages of documents. Discovery closed on March 14, 2016. (Dkt. 19.)

---

[15] Even if the 5471 penalties were abated, Miksic still incurred significant attorney's fees and costs seeking abatement.

Miksic served Cobb's expert report on March 31, 2016, over seven months after the Second Affidavit. Sawers Aff. ¶2. Defendants deposed Cobb for a full day on May 20, 2016. *Id.*

## ARGUMENT

### I.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A.  Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). It is the moving party's burden to establish that there is no genuine issue of material fact. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). All evidence and inferences must be viewed in a light most favorable to the nonmoving party. *Id.* at 255.

### II.  DEFENDANTS' MOTION SHOULD BE DENIED FOR FAILURE TO ABIDE BY THIS COURT'S LOCAL RULES

Defendants' brief exceeds 12,000 words. *See* Defs.' Word Count Cert. (ECF No. 35-1) ("I further certify that the above-referenced memorandum contains 12,671 words.") Local Rule 7.1(f) limits the word count in any memorandum supporting a motion to 12,000 words. D. Minn. LR 7.1(f)(1)(A) ("Except with the Court's prior permission, a party's memorandum of law must not exceed 12,000 words if set in a proportional font[.]"). A party seeking to exceed the word limit must "first obtain permission to do so by filing and serving a letter of no more than two pages requesting such permission." D. Minn. LR 7.1(f)(1)(D); *see also* D. Minn. LR 7.1, 2009 Advisory Committee Cmt. ("Requests to enlarge word limits must be made in writing — and permission must be

18

obtained — **before** filing a brief exceeding the word limit. LR 7.1(d)." (emphasis in original)). The 12,000-word limit applies to the cumulative limit of a supporting memorandum and reply memorandum in support of a motion. D. Minn. LR 7.1(f)(1)(B).

Local Rule 7.1 is not complex or obscure. It is a straightforward rule that is applicable to all civil motion practice before this Court. This District enforces Local Rule 7.1(f). *Randall v. Lady of Am. Franchise Corp.*, No. Civ. 04-3394 PJS/RLE, 2006 WL 6924259, at *1 (D. Minn. Sept. 13, 2006). In *Randall*, the district court denied a motion to exceed the word count limit. *Id.*

Here, Defendants did not request permission to exceed the word count limit contemporaneously with, much less prior to, the filing of their motion. The Court should deny Defendants' summary judgment motion based on non-compliance with Local Rule 7.1. *See Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 579 (8th Cir. 2006) ("District courts have broad discretion to set filing deadlines and enforce local rules.") (citation omitted). Alternatively, the Court should not allow—or consider—any reply memorandum. Defendants ignored Local Rule 7.1 at their peril and at a minimum should not be allowed to submit a reply brief.

## III. MIKSIC BROUGHT SUIT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS

Miksic's damages are not barred by the statute of limitations. Minnesota statutes prescribe a six-year statute of limitations period for professional malpractice claims, including accounting malpractice. *See* Minn. Stat. § 541.05, subd. 1(15). Miksic sued Defendants on November 24, 2014 and his cause of action accrued no earlier than

January 27, 2011, when the IRS issued its first penalty. The statute of limitations does not expire until January 27, 2017, at the earliest.

Defendants offer two separate but equally erroneous arguments to suggest that Miksic's claims accrued earlier. Defendants argue, first, that their negligent acts comprise a single course of representation such that all of their negligence relates back to the date of their first negligent act. Alternatively, Defendants argue that if each year of negligent tax advice is a distinct negligent act, Miksic suffered damage at the time that Defendants failed to advise Miksic of his foreign filing obligation. Under that secondary argument, Defendants seek to limit the number of years at issue. Each of Defendants' arguments lacks merit.[16]

### A.    Minnesota Applies the "Damage Rule" of Accrual for Statute of Limitations Purposes

Generally, there are three approaches to calculating the date on which a cause of action accrues for the purposes of evaluating the statute of limitations: (1) the "occurrence rule"; (2) the "discovery rule"; and (3) the "damage rule." *Antone v. Mirviss*, 720 N.W.2d 331,335 (Minn. 2006). Minnesota courts unambiguously apply the "damage rule."

---

[16] The instant lawsuit was filed on February 18, 2015, but the parties stipulated that the February 2015 complaint relates back to November 24, 2014. Accordingly, any claim that accrued as early as six years before November 24, 2014, i.e., November 24, 2008, is timely, even by Defendants' standard. The critical inquiry is the date on which Miksic's claims accrued, thereby triggering the six-year statute of limitations.

### 1.    Minnesota Rejected the "Occurrence Rule"

Defendants effectively advocate for the rejected "occurrence rule." Under the occurrence rule, the statute of limitations begins to run upon the occurrence of "nominal damages," which is "simultaneous[] with the performance of the negligent or wrongful act." *Antone*, 720 N.W.2d at 335. The occurrence rule states that the statute begins to run upon the commission of the negligent **act**, even though "there is **no actual damage** at that time." *Id.* (emphasis added) Minnesota rejected the occurrence rule in part because it encourages speculative litigation. *Id.*

### 2.    Minnesota Rejected the "Discovery Rule"

On the other end of the temporal timeline is the "discovery rule." Under the discovery rule, the cause of action accrues "only when the plaintiff knows or should know of the injury." *Id.* The Minnesota Supreme Court likewise rejected the discovery rule in part "because it provides open-ended liability." *Id.*

### 3.    Minnesota Applies the "Damage Rule"

In the "middle ground," Minnesota adopted the "'damage' rule of accrual, under which the cause of action accrues and the statute of limitations begins to run when 'some damage has occurred as a result of the alleged malpractice.'" *Id.* at 335-36 (quoting *Hermann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999)). This rule considers whether the negligent act has resulted in any compensable damage. *Id.* at 336.

Under the "damage rule," a plaintiff has suffered damage only when he could state a claim for relief. *See Hermann*, 590 N.W.2d at 643 (citing *Dalton v. Dow Chem. Co.*, 158 N.W.2d 580, 584 (Minn. 1968)). Merely breaching a standard of care by, for

21

example, failing to properly advise a client of a filing obligation is not compensable. *See, e.g.*, *Antone*, 720 N.W.2d at 335 (recognizing that a claim requires more than "nominal damages," such as the performance of a negligent or wrongful act; reaffirming the requirement of damage to trigger the statute of limitations).

*Anderson v. Benson* is instructive. 394 N.W.2d 171, 172 (Minn. App. 1986). In *Anderson*, a lawsuit resulted from the sale of a restaurant business. One count alleged that the seller failed to file a corporate tax return, exposing the corporation to potential future tax liability to the IRS. *Id.* at 173, 175. But because the "plaintiffs introduced no evidence of a present or threatened liability to the federal government," the court held that the plaintiffs' damages were "[s]peculative, remote, or conjectural," and, therefore, not recoverable. *Id.* at 175.

In other words, a claim for wrongful conduct that *might* result in tax liability to the federal government did not state a claim upon which relief could be granted because such a claim was speculative. Miksic could not have survived a motion to dismiss had he filed a lawsuit before the IRS took enforcement action against him and assessed penalties because, not only would he have had no notice of the claim, but his damages would have been "speculative, remote, or conjectural."

### 4.  **Applying the "Damage Rule," Miksic's Claim Accrued on January 27, 2011**

Miksic did not suffer **any** damage until January 27, 2011, the date he received notice of the IRS penalties. Miksic did not previously overpay taxes as a result of Defendants' negligence. He was not penalized as a result of Defendants' negligence, he

22

did not begin to incur interest charges, and critically—even had Miksic been aware of the negligence—he was not assured that any damage would **ever accrue,** until January 27, 2011. Prior to that date, there was no "present or threatened liability" to the government. There is no evidence that Miksic would ever be subject to IRS enforcement action, penalties, or other inquiry from the IRS prior to that time. The mere performance of a negligent **act** does not equate to damage and Miksic could not have stated a claim. *See, e.g.*, *Antone*, 720 N.W.2d at 335 (rejecting the occurrence rule based on the absence of actual damage and recognizing that mere "nominal damage" does not create a cause of action).

Despite the clear application of the damage rule, Defendants use a theory expressly rejected by the Minnesota Supreme Court and contend that Miksic's cause of action accrued upon the **occurrence** of their negligence—i.e., their failure to file, or advise Miksic to file, the Delinquent Forms. Under this theory, upon Defendants' negligent failure to file the Delinquent Forms, Miksic should have sued them, even though Miksic was unaware of the failure, the IRS had not penalized Miksic yet, and may never have penalized Miksic. That is precisely the speculative type of claim that the Minnesota Supreme Court sought to avoid in rejecting the occurrence rule.

In support of their argument, Defendants cite *Ames & Fischer Co., II, LLP v. McDonald*, 798 N.W.2d 557, 564 (Minn. App. 2011), in which the Minnesota Court of Appeals answered a narrow certified question regarding statutes of limitation. *Ames* is inapplicable.

In *Ames*, a partnership retained an accounting firm to prepare and file a tax return. *Ames*, 798 N.W.2d at 559. The certified question before the court in *Ames* was: "Does a cause of action for professional malpractice arising out of a failure to make a Section 754[17] election accrue when the tax return is filed without the election rather than when the automatic extension period expires?"[18] *Id.* at 562. Notably, failing to make a Section 754 election resulted in an **immediate** increased payment of income taxes by the plaintiff of between $2.5 and 1.9 million. *Id.* at 560.

In deciding the narrow question of when the cause of action for negligently failing to make a Section 754 election accrued, the Court held that the statute of limitations began to run when the "returns were filed without the Section 754 elections, which resulted in **the immediate overpayment of taxes and** ***the loss of the use of those funds***." *Ames*, 798 N.W.2d at 564 (emphasis added); *see also Hermann*, 590 N.W.2d at 643-44 (holding that malpractice occurred upon the completion of a transaction that created *immediate* tax liability and interest charges associated with unpaid tax for the client). The *Ames* Court did not rule that the mere negligent act of filing triggered the statute of limitations.

In stark contrast to *Ames*, here the failure to file the Delinquent Forms did not immediately affect Miksic and it may never have affected Miksic, but for the IRS's

---

[17] Section 754 is a complex tax provision which allows a partnership to increase the basis of its assets so that, upon transfer of those assets, the income tax burden decreases. Making a Section 754 "election" results in a lower tax liability for the year in which the taxpayer makes the election. A more detailed explanation of the effect of a Section 754 is set forth in *Ames*, 798 N.W.2d at 559-61.

[18] While the district court posed a similar question, the court of appeals reformulated the question as quoted here.

action. By violating a reporting requirement only, Miksic was damaged when the IRS called out the delinquency and he was actually penalized for failing to file the Delinquent Forms. Accordingly, the statute of limitations did not begin to run until January 27, 2011, the first date when the IRS levied penalties. Because Miksic brought a lawsuit in November 2014, just three years after the statute of limitations began to run, he is entitled to all of his damages flowing from Defendants' negligence.

### B.   Defendants Committed Separate and Distinct Acts of Negligence with Each New Failure to Advise Miksic of his Foreign Filing Obligation

#### 1.   Each Year Was A Separate Act

Defendants attempt to fix the accrual date of Miksic's claims in April 2006 by mischaracterizing the nature of Defendants' services as a de facto "continuous representation," such that all of Defendants' negligence relates back to 2006. Defendants also state that "*Hermann* is dispositive on this issue." They are wrong in all respects.

In *Hermann*, an individual business owner[19] brought suit against his attorneys and accountants for erroneous advice regarding a qualified employee trust plan (the "Plan"). *Hermann*, 590 N.W.2d at 642. The attorneys "represented Hermann [] in **creating the Plan**" in 1986. *Id.* Under the Internal Revenue Code, the Plan was prohibited from transacting business directly or indirectly with a disqualified person. *Id.* (citations to IRC omitted).

In 1987, Hermann entered into a joint venture with another company that operated under the name "Bridlewilde." *Id.* Hermann's attorneys drafted the documents

---

[19] Suit was also brought by Al Hermann Construction, Inc. ("AHC"), but there is no distinction between Hermann and AHC in the Supreme Court's analysis.

establishing the joint venture. *Id.* Neither Hermann's attorneys nor his accountants did anything else with respect to the Plan or the joint venture. *Id.* at 643-44. Hermann and Bridlewilde entered into a number of transactions over the next several years, some or all of which were prohibited because the Plan and joint venture were defective. *Id.* at 642-43. The Court held that, even though Hermann entered into a number of prohibited transactions over the course of the next approximately nine years, the cause of action first accrued when Hermann took action based on the establishment of the joint venture, when his lawyers failed to inform him of the prohibited nature of transactions between Hermann and Bridlewilde. *Id.*

Two points bear highlighting. First, *Hermann* did not involve a series of transactions based on **fresh advice**, but rather a series of transactions based on the attorneys' involvement in the creation of the joint venture. Second, while Defendants attempt to vaguely compare *Hermann* with their own negligence in this case, that effort falls short.

The distinction between *Hermann* and Miksic's relationship with Defendants is clear: in *Hermann*, the professionals gave advice once, and Hermann acted on that advice for nearly a decade; here, Defendants were under a new obligation **every year** to conduct an investigation of the facts and prepare the appropriate tax documents. *Hermann* does not support the proposition for which Defendants cite it.

Likewise, Defendants rely on the unpublished decision rendered in *Reid Enters. v. Deloitte & Touche, LLP*, No. C8-99-1801, 2000 WL 665684 (Minn. App. May 23,

2000),[20] which is also factually distinct from the matter presently before the Court. Aside from having no value from a precedential standpoint, its value is rendered useless due to the nature of the IRS penalty.

In *Reid*, a car dealership retained Deloitte & Touche to perform accounting services in 1981. *Id.* at *1. Deloitte used the "last in, first out," or LIFO, method of accounting for income taxes and used the "first in, first out," or FIFO, method of accounting for reporting inventory levels to the dealerships' car manufacturers. *Id.* Based on an IRS rule called the "LIFO Conformity Rule," however, car dealerships were required to use LIFO or FIFO for **both** income taxes and inventory reporting. *Id.* In 1997, the IRS issued Revenue Procedure 97-44, which required car dealers to self-report any violations of the LIFO Conformity Rule for tax years 1991 to 1996. *Id.* Violations of the LIFO Conformity Rule, regardless of how many violations, resulted in the **same penalty**. *Id.* at *2.

*Reid* is distinguishable based on the simple fact that any number of violations during the six-years preceding Revenue Procedure 97-44, or in 1995 resulted in the same, singular penalty. *Id.* at *2. That is, there was no new damage. Instead, the penalty "had attached and was irreversible." *Id.* at *2-3 ("Any later negligence by D & T, including that which Reid claims with respect to a 1993 LIFO project, is therefore without consequence.").

---

[20] *Reid* is of no value to the Court's analysis because it is unpublished and, as a result, is not precedential. *See, e.g.*, *Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 676 n. 3 (Minn. 2004); *State ex rel. Hatch v. Emp'rs Ins. of Wausau*, 644 N.W.2d 820, 828 (Minn. App.2002).

27

Here, on the other hand, Defendants' malpractice caused new, distinct damage for **each year** during which they failed to advise Miksic of his foreign filing obligations. As set forth above, the IRS penalized Miksic in 2011 for each year, unlike *Reid*, where the IRS levied a single penalty "regardless of how many conformity violations Reid had during the six year preceding [Rev. Proc. 97-44]." *Id.* at *2.

Defendants attempt to extract more from *Hermann* and *Reid* than those cases justify. The law is clear: a cause of action for professional malpractice accrues anew each time negligent advice is given (but is not ripe until damage is suffered). *See Bonhiver v. Graff*, 248 N.W.2d 291, 296 (Minn. 1976). Each year, Defendants presented Miksic with a new set of IRS filings. And each year, Defendants failed to advise Miksic of his foreign filing obligations. In light of that failure, in 2011, the IRS penalized Miksic for **each delinquent year**. *Hermann* does not apply because the professionals in question provided advice once, in connection with establishing the Plan and the joint venture. And *Reid* does not apply because the damage that accrued when Deloitte first gave its negligent advice was static; the IRS penalty did not grow with each violation of the LIFO Conformity Rule. Defendants' negligence does not relate back to April 2006, when Defendants first committed a negligent act.

Defendants do not provide any basis in law or fact to establish an April 2006 accrual date for Miksic's claims. But even if Defendants established a "continuous representation," that would require the Court to begin counting the statute of limitations as of the date of the **last** negligent act, not the first one. The Minnesota Supreme Court has held that, where multiple negligent acts are construed as forming a pattern,

continuous patterns of negligence do not accrue until the final negligent act has occurred. *Bonhiver*, 248 N.W.2d at 296; *see also Anoka Orthopaedic Assocs., P.A. v. Mutschler*, 773 F. Supp. 158, 169 (D. Minn. 1991) ("In an accounting malpractice action, the Minnesota Supreme Court [had] held that the statute of limitations [begins] to run as of the date of defendants' last negligent act."); *May v. First Nat'l Bank of Grand Forks*, 427 N.W.2d 285, 289 (Minn. App. 1988).

Because no damage accrued until the IRS recognized that Miksic did not file the Delinquent Forms, the statute of limitations did not begin to run until January 2011. Defendants' contentions suggesting otherwise are contrary to Minnesota law.

## IV. <u>MIKSIC COMPLIED WITH MINN. STAT. § 544.42 AND EVEN IF HE DID NOT, DISMISSAL IS NOT THE STATUTORILY PRESCRIBED REMEDY</u>

Defendants next accuse Miksic of including only attorney argument and conclusory statements in Miksic's Second Affidavit and advocate dismissal on those grounds. But in reality, the Second Affidavit contains Cobb's analysis at the time the Affidavit was served, and amply summarizes the bases for his opinion, as required by Minn. Stat. § 544.42. Furthermore, even if the Court finds that Miksic's Second Affidavit deviated from the requirements of Minn. Stat. § 544.42, subd. 4, the statutorily mandated response is not dismissal, but a court notice detailing the deficiencies and providing Miksic an opportunity to cure. *See* Minn. Stat. § 544.42, subd. 6(c) ("an initial motion to dismiss an action under this paragraph based upon claimed deficiencies of the affidavit…shall not be granted unless, after notice by the court, the nonmoving party is given 60 days to satisfy the disclosure requirements in subdivision 4.").

29

### A.    Miksic's Second Affidavit complies with Minn. Stat. § 544.42

Parties asserting claims for professional malpractice, including claims against certified public accountants, must satisfy certain requirements. *See* Minn. Stat. § 544.42, subds. 1, 2. The statute requires malpractice plaintiffs to serve two different affidavits of expert review, one at the outset of the litigation and one after discovery has begun. *See id.*, subds. 2-4. "[T]he intent of section 544.42 is to avoid the waste of time and money spent on defending against frivolous actions that will ultimately be the subject of a directed verdict." *Brown-Wilbert, Inc. v. Copeland Buhl & Co., P.L.L.P.*, 732 N.W.2d 209, 219 (Minn. 2007).

Regarding the second affidavit, the statute requires a malpractice plaintiff to serve the affidavit "within 180 days of commencement of discovery," which must:

> state the identity of each person whom the attorney expects to call as an expert witness at trial to testify with respect to the issues of negligence, malpractice, or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Minn. Stat. § 544.42, subds. 2(2), 4(a). This affidavit "must be signed by the party's attorney." *Id.*, subd. 4(a).

Here, Miksic timely served his Second Affidavit on August 17, 2015 and his expert report over seven months later, on March 31, 2016.

Defendants claim that the Second Affidavit contains "only attorney argument" and "does not actually include Cobb's opinion." In so doing, Defendants apparently conflate the requirements of Minn. Stat. § 544.42, subd. 4 with the requirements of an expert report.

As noted, the statute requires an affidavit "by the party's attorney" setting out "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Minn. Stat. § 544.42, subd. 4 (emphasis added). In contrast, Fed. R. Civ. P. 26(a)(2)(B) requires more thorough and robust recitation of the expert's opinion in the expert report, including (i) a "complete statement of all opinions the witness will express and the basis and reasons for them;" and (ii) "the facts or data considered by the witness in forming them." (Emphasis added.) Unlike the affidavit of expert review, the expert report must be prepared and signed by the expert witness. *See* Fed. R. Civ. P. 26(a)(2)(B).

The deadlines assigned to the two documents necessarily contemplate that the report will be a more thorough discussion of the expert's opinions. The affidavit is required within 180 days after discovery begins, whereas the report is required months later, after discovery has closed and the parties have had an opportunity to gather information relevant to the expert's opinion.

It should come as no surprise that Cobb's expert report includes more detail than the summary affidavit provided by counsel seven months earlier. The Second Affidavit expressly contemplated the addition of details and analysis learned by virtue of discovery in the case. Berger Aff., Ex. 7 ¶¶3 ("Further, the facts and grounds for Cobb's opinions and Cobb's opinions may change through the course of discovery and analysis."), 17 ("These failures are only a summary, as required by Minnesota Statute, of some of the known failures to date. As discovery continues in this matter, it is expected that the number and types of failures will increase and diversify.").

31

Moreover, Defendants' claim that the Second Affidavit contains only attorney argument ignores the Second Affidavit itself. For instance, the Second Affidavit cites six specific SSTS, six specific provisions of the AICPA Code of Professional Conduct, and six specific requirements of Treasury Department Circular No. 230. Berger Aff. Ex. 7, ¶¶8, 9. It goes on to catalog breaches of the standards of care and describe Cobb's opinion or expected testimony. *Id.* ¶¶13, 14, 18-20.

Defendants make much of Cobb's testimony that he first reached his expert opinion in early 2016. But had Defendants asked Cobb during his full-day deposition, he would have told them that the Second Affidavit reflected his analysis at the time it was submitted. Affidavit of Arthur Cobb, ¶2. That Cobb's expert opinion had not been cemented when discovery was in its infancy is unsurprising, entirely consistent with the "summary" required by Minn. Stat. § 544.42.

Defendants also assert that the Second Affidavit posits only "conclusory and conjectural statements" regarding the elements of Miksic's malpractice claim. In so doing, Defendants rely almost entirely on a comparison to the Minnesota Supreme Court's holding in *Guzick v. Kimball*, 869 N.W.2d 42 (Minn. 2015). (Dkt. 35 at 27.) Defendants' reliance is misplaced and is belied by the Second Affidavit itself.

In *Guzick*, the plaintiff brought a single count of legal malpractice and utterly failed to provide a second affidavit of expert disclosure. *Guzick*, 869 N.W.2d at 45. Rather, in response to defendant's interrogatories, plaintiff identified the expert he had

32

retained and simply referred defendant back to his first affidavit of expert review.[21] *Id.*
The first affidavit merely identified ten acts committed by defendant that allegedly
deviated from the standard of care and caused damages. *Id.* No information was provided
regarding causation. *See id.*

Similarly, in *Brown-Wilbert*, also cited by Defendants, the Minnesota Supreme
Court confirmed that interrogatory answers did not satisfy the requirements for a second
affidavit under Minn. Stat. § 544.42 when the answers did "not identify or define any
specific accounting standard of care, state how Accountants deviated from that standard
of care, or allege how that deviation caused injury." 732 N.W.2d at 219.

Here, in stark contrast, the Second Affidavit lists at least nine different accounting
standards that apply to form the standard of care Defendants owed to Miksic. *See* §H.1.,
*supra*. The Second Affidavit details a host of ways in which Defendants breached the
standards of care.[22] *See* §H.2., *supra*. And it states that Defendants breaches "directly and
proximately caused Miksic damage," but not by conclusory proclamation as Defendants
insist. *See* §H.3., *supra*. To the contrary, the Second Affidavit explains that Miksic would
not have incurred damages had Defendants complied with the applicable standards of
care. Berger Aff., Ex. 7, ¶19. Considering and dispensing with other causation factors, the

---

[21] In *Guzick*, the court refers to the first affidavit required by Minn. Stat. § 544.42 as the
"affidavit of expert review" and the second affidavit as the "affidavit of expert
disclosure." *See* 869 N.W.2d at 47.

[22] To the extent Defendants claim that they did not form an accountant-client relationship,
or that the Second Affidavit does not sufficiently describe that relationship, the existence
of such a relationship is not in dispute. Both the Parnell and Edmunds Affidavits admit
Miksic "is a client of" their accounting firm. *See* Edmunds Aff. ¶4; Parnell Aff. ¶4.

Second Affidavit explains that Miksic would not be expected and was indeed unaware that the requisite forms had gone unfiled, that it was reasonable for Miksic to assume that required forms would be filed because they had been in the past, and that it was reasonable for Miksic to rely on his accountants. *Id.* ¶21. Accordingly, Miksic "would not be expected to have known of or prevented the delinquency that gave rise to the IRS investigation and subsequent assessments and damages." *Id.* Defendants, not Miksic, caused Miksic's damage.

Defendants' challenges to the Second Affidavit are devoid of legal or factual support, and should be rejected.

### B.    Any Second Affidavit deficiencies compel a Court order and cure period, not dismissal

Cobb's expert report was entirely consistent with the Second Affidavit; Defendants do not claim otherwise. Furthermore, Defendants deposed Cobb and had a full opportunity to explore with him all bases of his opinions, including the applicable standards of care, breaches, causation, and damages. Defendants' challenges to the Second Affidavit reveal an attempt to escape liability on an imagined and non-prejudicial technicality, nothing more.

Yet even if the Second Affidavit is deficient, dismissal is not the remedy. Instead the statute prescribes a procedure by which the Court should identify the specific deficiencies, and Miksic should be granted an opportunity to cure them, before the claims can be dismissed.

> Failure to comply with subdivision 4 results, upon motion, in mandatory dismissal of each action with prejudice as to which

34

> expert testimony is necessary to establish a prima facie case, provided that an initial motion to dismiss an action under this paragraph based upon claimed deficiencies of the affidavit or answers to interrogatories shall not be granted unless, after notice by the court, the nonmoving party is given 60 days to satisfy the disclosure requirements in subdivision 4. In providing its notice, the court shall issue specific findings as to the deficiencies of the affidavit or answers to interrogatories.

Minn. Stat. § 544.42, subd. 6(c) (emphasis added).

As discussed above, the Second Affidavit provides the substance and summary required by Minn. Stat. § 544.42, subd. 4. If the Court nonetheless finds deficiencies, it "shall issue specific findings as to the deficiencies." Miksic is then entitled to a 60-day cure period. Dismissal is not the appropriate or sanctioned response to Defendants' claims of Second Affidavit deficiencies in the instant motion. Defendants' contentions otherwise ignore the express language of the statute.

## V.    MIKSIC'S EXPERT IS NOT PRECLUDED FROM TESTIFYING AT TRIAL

Defendants next argue that Miksic's expert, Arthur Cobb, is precluded from testifying at trial and, therefore, Miksic cannot carry his burden as to liability or causation. Defs.' Br. 4. As presented in Miksic's Memorandum In Opposition to Defendants' Motion to Exclude Expert Testimony of Arthur H. Cobb filed contemporaneously herewith, Defendants' effort to banish Cobb will fail.

## VI.    DEFENDANTS' AFFIRMATIVE DEFENSES OF *IN PARI DELICTO* AND LACHES ARE NOT APPLICABLE

### A.    *In Pari Delicto*

Defendants seek to avoid liability by arguing that Miksic, who is neither an accountant nor a tax expert, was equally at fault and, therefore, cannot recover against Defendants for their palpable and admitted negligence. To the contrary, as a lay person, Miksic reasonably relied on the professional advice of his accountants and, as a result of their negligence, was penalized by the IRS. Reliance on an accounting or tax professional is reasonable as a matter of law:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the [accountant or] attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Ordinary business care and prudence does not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 250-251 (1985).

The doctrine of *in pari delicto* requires equal fault. Defs.' Br. 32. And *Head v. AAMCO Automatic Transmissions, Inc.*, the leading case on the doctrine of *in pari delicto* in Minnesota, makes clear that the doctrine is reserved for situations in which two parties willingly act in concert to bring about harm. 199 N.W.2d 444, 448 (Minn. 1972). The doctrine "is...applicable to tortious transmissions based on fraud or similar intentional wrongdoing." *Id.*; *see also Brubaker v. Hi-Banks Resort Corp.*, 415 N.W.2d 680, 684 (Minn. App. 1987) (describing the doctrine of *in pari delicto* as "recogniz[ing] that

judicial refusal to be involved arises only in those cases where the court is asked to do something that is itself part of the unlawful act.").

Here, Defendants' negligence caused Miksic damage by exposing him to IRS liability. Miksic was entitled to rely completely on Defendants and the advice of their professionals.[23] Miksic did not intentionally "act in concert with" Defendants to bring upon himself millions of dollars in IRS penalties. Defendants' suggestion otherwise is absurd. At the very least, Defendants' blame-transferring defense should be subject to jury scrutiny and is not fit for summary disposition.[24]

To advance their groundless defense, Defendants rely on *Christians v. Grant Thornton*, but that case is inapposite. 733 N.W.2d 803, 806 (Minn. App. 2007). In *Christians*, the Technimar Industries, Inc.'s rogue chief executive officer made an affirmative decision contrary to his company's best interest in entering into an off-the-books transaction, which he later concealed from the company's auditor, Grant Thornton. *Id.* at 806-07. As a result, Grant Thornton's audit incorrectly determined that the company was solvent when it was not. *Id.*

In July 1998, Technimar filed for bankruptcy protection. *Id.* Christians, the bankruptcy trustee, brought an auditor malpractice lawsuit against Grant Thornton in

---

[23] To the extent Defendants try to blame McGillivray for not catching their errors, Defendants did not include McGillivray in meetings discussing Miksic's financial accounts. Ex. 5, at 49 (Deposition Testimony of Angie McGillivray, hereinafter cited as "McGillivray D.[##]"). Also, Defendants admit "Miksic never told McGillivray he expected her to review his taxes and, as a result, she never did." Defs. Br. 12.

[24] Defendants claim Miksic did not disclose the Rust Foundation, yet admit Miksic testified "Lozinski knew all about his foreign accounts and the Rust Foundation." Defs. Br. 42. That alone creates a question of fact on the issue.

March 2003. *Id.* In *Christians* it was apparent that there was a "scheme to deceive outsiders" by Technimar. *Id.* at 814 (quoting *Long v. Smead Mfg. Co.*, 383 N.W.2d 452, 455 (Minn. App. 1986)). In discussing the doctrine of *in pari delicto*, the court acknowledged that "inequitable actions of officers and directors" of a corporation are "imputed to corporation." *Id.* at 810. Based on Technimar's inequitable conduct, which caused its bankruptcy, the court of appeals affirmed application of *in pari delicto* to bar the trustee's claim against Grant Thornton. *Id.*

*Christians* has nothing to do with this case. Here, there is no evidence that Miksic schemed to deceive Defendants or the IRS. He simply relied on advice of the same professionals he had for years regarding foreign filing obligations, which Defendants' expert concedes are "difficult" for taxpayers. The Supreme Court has acknowledged the right of a taxpayer like Miksic to rely on his CPA. *United States v. Boyle*, 469 U.S. 250-251 ("Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the [accountant or] attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.").[25]

---

[25] Defendants cite *Thomas v. UBS AG*, 706 F.3d 846 (7th Cir. 2013) to support their *in pari delicto* defense. Citation to *Thomas* is misleading: *Thomas* does not mention the doctrine of *in pari delicto*. Likewise, the plaintiffs in *Thomas* were "tax cheats" who, with the assistance of their bank, committed fraud. *See id.* at 850, 853. Likewise Defendants cite to *Giordano v. UBS AG*, 134 F. Supp. 3d 697, 700 (S.D.N.Y. 2015), where the client willfully hid her foreign accounts and her foreign income from the IRS. Neither *Thomas* nor *Giordano* bear on Miksic's claims.

### B.    Laches

#### 1.    Inapplicable As a Matter of Law

Defendants' reliance on the doctrine of laches does not stand up to scrutiny. As a threshold matter, laches is unavailable as a matter of law because it is "'premised upon the same principal that underlies the statute of limitations: the desire to avoid unfairness that can result from the prosecution of stale claims.'" *Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d 1067, 1081 (D. Minn. 2007) (quoting *Midwestern Mach. Co. v. Nw. Airlines, Inc.,* 392 F.3d 265, 277 (8th Cir.2004)); *see also Aronovitch v. Levy*, 56 N.W.2d 570, 573-74 (Minn. 1953) ("Where a party seeking a legal remedy upon a legal right, we have held that the doctrine of laches has no application and that the remedy will be barred only by the statute of limitations."). Accordingly, Defendants' laches defense fails because Defendants assert this case is governed by a statute of limitations.[26]

Even if laches could apply in this case, Defendants must demonstrate that (1) Miksic unreasonably and inexcusably delayed commencing his action; and (2) Defendants must have suffered prejudice as a result. *Midwestern Mach. Co.*, 392 F.3d at 277 (quoting *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir.1979)).

#### 2.    No Unreasonable Delay or Prejudice

Defendants offer no basis to support a finding of delay by Miksic in filing this lawsuit. Defendants' state, without identifying a factual basis or offering any analysis that

---

[26] The application of laches is a very fact-intensive inquiry which "generally cannot be decided on a motion for summary judgment." *Axcan Scandipharm*, 585 F. Supp. 2d at 1081 (collecting cases); *see also Azalea Fleet, Inc. v. Dreyfus Supply & Mach. Corp.*, 782 F.2d 1455, 1458 n.2 (8th Cir. 1986) (noting the "fact-bound nature of the laches issue").

"Miksic [sat] on his hands for many years before filing this case." Defs. Br. 41. But in reality, Miksic brought the case just over three years after learning that the IRS intended to penalize him for Defendants' negligence.

The hallmark of a laches defense is a plaintiffs' <u>knowledge</u> and failure to act. In every case applying the doctrine of laches, the plaintiff was aware of the existence of a claim but failed to bring it for some reason. *See, e.g.*, *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) (finding unreasonable delay where plaintiff knew of wrongful conduct for **<u>nine years</u>** before bringing a claim); *Dane Techs., Inc. v. Gatekeeper Sys., Inc.*, 135 F. Supp. 3d 970, 992 (D. Minn. 2015) (finding presumption of laches in a patent case where plaintiff knew of infringing conduct for **<u>six years</u>** before bringing suit); *Carlson v. Ritchie*, 830 N.W.2d 887, 891 (Minn. 2013) (considering whether "there has been such an unreasonable delay in asserting a **known** right" (emphasis added)); *Commerce Bank v. Manley Comm'l, Inc.*, No. A11-407, 2011 WL 6757440, at *6 (Minn. App. Dec. 27, 2011) (considering whether plaintiff "was aware of" facts giving rise to claim).

Here, there is no doubt that Miksic was completely unaware of Defendants' negligence until he was notified by the IRS that he had not met his foreign filing obligations. Likewise, when Miksic first learned of Defendants' ineptitude, he afforded Defendants an opportunity to mitigate the damage they inflicted by assisting in the penalty abatement process. Defendants can hardly claim they were surprised by a lawsuit given that they were fighting alongside Miksic to fend off the IRS.

Finally, the doctrine of laches is an equitable doctrine. The "equitable" position Defendants espouse is circular and decidedly inequitable: On one hand, Defendants argue that Miksic "inexcusably [or] unreasonably delay[ed]" bringing this lawsuit; they argue that Miksic sat on his rights. But on the other hand, Defendants submit the argument that Miksic's claim for recovery of FBAR penalties must be dismissed on the grounds of prematurity; Defendants argue that to sue them, Miksic must wait until after the IRS finally rejects his FBAR appeals. Miksic, according to Defendants, is both too late and too early. It is difficult to conjure a more illogical and inequitable position.

As to prejudice, Defendants intimate that they were prejudiced because Miksic somehow purposely waited until Cliff Lozinski passed away on March 16, 2014 and unidentified evidence was lost or destroyed. Defs.' Br. 42 ("With only his lack of action to blame, Miksic has no justification for waiting at least eight years before bringing this action, while evidence was lost, forgotten, and destroyed in the meantime, including the death of Lozinski. Allowing Miksic's claims to proceed after evidence and critical witness testimony has been lost would not only reward him for his indifference and inattention[.]"). This speculation defies logic, suggesting that Miksic foresaw Lozinski's death while knowing that Lozinski would bring imagined critical evidence to his grave. Moreover, at no point during this litigation have Defendants identified any documents that have been "lost, forgotten, or destroyed." Their laches defense should be rejected.

## VII.    MIKSIC IS ENTITLED TO ALL FEES PAID TO DEFENDANTS AND ALL FINES OR PENALTIES FROM THE IRS

### A.    FBAR Penalties Are Not Speculative

Defendants argue the Miksic's FBAR penalties, levied by the IRS in 2011, are speculative and unrecoverable because they are currently being appealed. The cases Defendants cite do not support this proposition.

First, Defendants cite *Lewin v. Miller Wagner & Co., Ltd.*, 725 P.2d 736, 740-41 (Ariz. App. 1986) and characterize the court as "holding that evidence regarding damages due to disallowance of stock straddle losses based on testimony of IRS agent was completely speculative as to the amount of damages caused by accountants' alleged malpractice absent showing as to whether the agent's determination was likely to be upheld either at higher administrative level or against legal challenge to straddle losses." Defs. Br. 44. Defendants' characterization is incorrect. In *Lewin*, the IRS agent had not levied any penalties at all. *Lewin*, 725 P.2d at 740-41. In fact, the court in *Lewin* held that the plaintiffs "proved with reasonable certainty the amount of damages they would sustain if the [IRS] disallowed the straddle losses….[W]e also find sufficient evidence from which the defendants could be found liable for these damages if they were to occur." *Id.* at 741. The court went even further to state that there was evidence that the IRS agent would challenge the losses, but there was no evidence whether the losses would be affirmed at the higher level of review. *Id.*

Here, in contrast with *Lewin*, the IRS has leveled substantial penalties based on Miksic's failure to file FBARs. Miksic's appeal of the penalties is consistent with his mitigation obligation, and does not render the penalties speculative.

Defendants also rely on *Olson, Clough & Straumann, CPA's v. Trayne Properties, Inc.*, 392 N.W.2d 2, 4 (Minn. App. 1986) [hereinafter, "*Olson*"]; as with *Lewin*, Defendants give *Olson* very misleading treatment. Defendants cite *Olson* as de facto "affirming the trial court's determination that a portion of the plaintiff's damages in the accounting malpractice claim was too speculative and not recoverable as a consequence." Defs. Br. 44. In *Olson*, an accounting firm sued its client for unpaid bills; the client asserted a malpractice counterclaim seeking "$499,750 in damages resulting from the malpractice committed by [Olson] because of damage to its reputation, loss of business, and loss of commission revenue." *Id.* at 4. In support of those speculative categories of damages, the client conducted a survey of eighty-nine investors, who said they would either never invest with the client, probably would not invest in the future, or questioned the client's ability to provide timely tax data. *Id.* The Minnesota Court of Appeals affirmed the district court's denial of lost profits because "the 'nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts.'" 392 N.W.2d at 4 (quoting *Olson v. Aretz,* 346 N.W.2d 178, 182 (Minn. App. 1984), *pet. for rev. denied* (Minn. Oct. 30, 1984)).

So in *Olson*, the client's damages theory was based on the client's ruined reputation and lost future business, which the Court could not calculate with reliability.

43

Here, on the other hand, the amount—and fact—of Miksic's damages are fixed by the IRS penalties. While *Olson* was an accounting malpractice claim, the similarities between it and this case ends there.

Finally, Defendants cite *Vesta State Bank v. Independent State Bank of Minnesota*, 518 N.W.2d 850 (Minn. 1994), for the general doctrine of election of remedies and the prohibition against double recovery. Defs. Br. 45. Again, as with *Lewin* and *Olson*, Defendants selectively cite to *Vesta*. Under *Vesta*, "if inconsistent remedies are sought and it is doubtful which one will bring relief, a party may claim either or both alternatively until one remedy is pursued to determinative conclusion." *Id.* at 855.

*J & M Associates, Inc. v. Callahan*, 753 F. Supp. 2d 1183 (S.D. Ala. 2010) provides more helpful guidance. In *Callahan*, an insured brought suit against its insurer alleging that the insured's enrollment in a welfare benefit plan ultimately led to "huge tax liability and penalties." *Id.* at 1185. The insured ultimately enrolled in a benefit plan with prohibitions on certain financial transactions. *Id.* at 1188, 1201-02. The IRS assessed penalties against the insured for $400,000 for its failure to disclose its participation in the prohibited transactions. *Id.* at 1201.

At the time of summary judgment in *Callahan*, the insured had not paid the IRS penalties. *Id.* at 1216. The insurer asked the court to grant summary judgment as to the unpaid penalties, arguing that the insured "'cannot claim 6707A penalties as damages' because those damages 'are too speculative' since '[t]he IRS has assessed, but [insured] has not paid, 6707A penalties in the amount of $400,000' and '[l]egislation has passed

44

the Senate and the House of Representatives that may eliminate [insured's] [IRS] penalties." *Id.* (quoting insured's memorandum of law).

The *Callahan* court rejected the insurer's argument, stating that the "damages are not speculative simply because [insured] has not paid the penalties, especially since the IRS has determined a specific amount owed and the case allegedly has been transferred to another Revenue Agent for collection." *Id.* Thus, under *Callahan*, IRS penalties in a fixed amount are not speculative, even though the taxpayer has not paid the penalty, and even though the penalty may decrease or be eliminated entirely.[27]

### B.   Miksic Is Entitled to All Fees Paid To Lawyers, Including Those Incurred in This Action

It is well-settled under Minnesota law that where a malpractice plaintiff is thrust into tertiary litigation, the fees incurred in that litigation are recoverable. *Hill v. Okay Const. Co.*, 252 N.W.2d 107,121 (Minn. 1977) (holding that fees are recoverable "when the attorneys' fees and expenses claimed are incurred in other litigation which is necessitated by the act of the party sought to be charged.") (emphasis added). Here, Miksic was required to retain legal representation to respond to the IRS audit and mitigate those penalties as well as protect against potential criminal prosecution.

Furthermore, Miksic has paid attorneys' fees and accounting expert fees in connection with this malpractice lawsuit, which is itself another mitigation effort. Courts

---

[27] Under *Anderson*, described above, Miksic could not have brought his claim until he was penalized by the federal government. Accordingly, if the Court considers the FBAR penalties unduly speculative at this time, a more equitable and practical remedy would be to bifurcate the liability and damages portions of the case and try damages after the FBAR appeal is exhausted.

45

allow recovery of attorney's fees associated with the malpractice suit by characterizing fees as damage mitigation. *See, e.g.*, 3 Legal Malpractice § 21:28 (2015 ed.) (allowing attorney-fee recovery as "the right to recover legal expenses incurred" as a damage element related to mitigating the damages caused by the malpractice). Because Miksic must pursue this litigation to assist in mitigating his damages, his fees are recoverable.

## CONCLUSION

Defendants rightfully do not contest that they breached the standard of care owed to Miksic. But their scattershot defenses fare no better, and do not support dismissal of Miksic's claims. The Court should deny Defendants' motion and set this case for trial.

Dated: August 12, 2016                **BRIGGS AND MORGAN, P.A.**

By: *s/ Gregory J. Stenmoe*
    Gregory J. Stenmoe (#131155)
    Britt M. Gilbertson (#034977X)
    Michael M. Sawers (#392437)
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2157
(612) 977-8400

**ATTORNEYS FOR BORIS A. MIKSIC**

7811308v20

46